# STATE OF CONNECTICUT *v.* TERRELL CANADY
## (SC 17875)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

This case was argued prior to the implementation of the policy of this court to hear all cases en banc.

Argued January 15, 2009—officially released July 6, 2010

*Deborah G. Stevenson*, special public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, was *Kevin D. Lawlor*, state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, Terrell Canady, guilty of one count each of felony murder in violation of General Statutes § 53a-54c, manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1), and robbery in the first degree in violation of General Statutes § 53a-134 (a) (1). The trial court rendered judgment in accordance with the verdict and sentenced the defendant to a total effective sentence of seventy-five years imprisonment. On appeal,[1] the defendant, who was fifteen years old at the time of the offenses, claims that the trial court improperly (1) permitted the state to introduce into evidence statements that he had made to a juvenile detention officer because they were inadmissible under General Statutes § 46b-137 (a),[2] (2) denied his motion to suppress those

---

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[2] General Statutes § 46b-137 (a) provides: "Any admission, confession or statement, written or oral, made by a child to a police officer or Juvenile Court official shall be inadmissible in any proceeding concerning the alleged delinquency of the child making such admission, confession or statement unless made by such child in the presence of his parent or parents or guardian and after the parent or parents or guardian and child have been advised (1) of the child's right to retain counsel, or if unable to afford counsel, to have counsel appointed on the child's behalf, (2) of the child's right to refuse to make any statements and (3) that any statements he makes may be introduced into evidence against him."

statements because they were obtained in violation of his rights under *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and (3) admitted into evidence statements made by a third party as the defendant's own statements under the hearsay exception for adoptive admissions. We reject the defendant's claims and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. During the late evening hours of October 17, 2004, the defendant, a New Haven resident, and his fourteen year old friend, Nadrian Campbell, a resident of West Haven, were walking through West Haven when they encountered the victim, Robin Swick. The defendant asked the victim if she wanted to have sex with him, and the victim agreed to do so as long as the defendant paid her. The victim, Campbell and the defendant then went behind a store where the victim engaged in sexual acts with the defendant and Campbell.

Thereafter, the three continued to walk around West Haven. After a period of time, the defendant decided that he wanted to have sex with the victim again, and he borrowed $50 from Campbell to do so. At this point, the victim and the defendant, who, along with Campbell, were standing in front of a furniture store, went behind one of the store's delivery trucks and engaged in sexual intercourse. When Campbell next saw the defendant and the victim, the defendant was holding the victim's clothes, and the victim, who was standing next to the defendant, was wearing only a pair of socks. The victim's cell phone fell from her clothes, and, as she went to pick it up, the defendant, who was wearing boots, kicked her in the mouth. Campbell walked away and did not see the defendant strike the victim again. After Campbell left, however, the defendant repeatedly assaulted the victim, leaving her severely wounded.

Ten minutes later, the defendant, carrying the victim's clothes and cell phone, approached Campbell a few blocks away. The defendant returned Campbell's money, informing Campbell that he had robbed the victim. Shortly thereafter, the defendant threw the victim's clothes into a nearby alleyway.

The defendant and Campbell eventually walked to the home of Kendra Bryant, arriving there at approximately 3 a.m. on October 18, 2004. Bryant opened a window and let Campbell climb inside, where he joined Bryant and her friend, Ebony Howell, who was spending the night at Bryant's residence. The defendant remained outside but told the group of persons inside, who were within hearing distance, that "he . . . beat up some lady and took her cigarettes and stuff." Campbell also told Bryant and Howell that the defendant had struck the victim and stole her cell phone and cigarettes. After approximately one hour, Campbell and the defendant left.

Later that morning, the defendant went to the home of Roscoe Morrison. The defendant told Morrison that, while the defendant was out the previous evening, he had "beat[en] [a] lady" and stolen her money and cell phone. The defendant then asked Morrison's half sister, Shanette Hargrove, to charge the victim's cell phone and to lend him a t-shirt. The defendant told Hargrove, "I think I killed somebody." Hargrove initially thought that the defendant was joking, but the defendant elaborated: "I kicked her in the face, but I don't know if she's dead." Soon thereafter, the defendant left for school, leaving the victim's cell phone at Morrison's house along with a book bag containing the defendant's boots, shirt and jeans.

Carey Benjamin, an employee of the furniture store behind which the defendant left the victim, discovered the victim's body lying between two of the store's deliv-

ery trucks at approximately 8 a.m. that same morning and called 911. The victim, who was wearing only a pair of socks, was pronounced dead shortly after the police arrived. An autopsy revealed that the victim had eight broken ribs and between forty and fifty abrasions on her body, including her face.

At approximately 2 p.m. that same day, Hargrove received an incoming call on the victim's cell phone and, upon answering it, the caller asked, "Robin?" Hargrove immediately ended the call. After receiving another phone call, Hargrove began making outgoing calls. Later that evening, while watching the news, Hargrove learned that a woman named Robin had been killed. Hargrove then showed her mother the bag containing the defendant's clothes, and they both observed what appeared to be bloodstains on the clothing. Hargrove promptly called the defendant's aunt, Tiya Canady. Tiya Canady arrived shortly thereafter and took the victim's cell phone, which she destroyed, and the defendant's clothing.

The next day, October 19, 2004, the defendant called Campbell and left a voice mail on Campbell's cell phone instructing Campbell about how he should handle possible police questioning concerning the incident involving the victim. Specifically, the defendant told Campbell that, if asked about the incident, he should say that he and the defendant had seen the victim's husband beating the victim, that the victim's husband saw the defendant and Campbell watching, that the victim's husband told the defendant and Campbell that he would shoot or pistol whip them if the defendant did not kick the victim as well, and that the defendant then kicked the victim twice. Later that day, the defendant was arrested on the basis of a warrant charging him with a violation of probation.[3] Following his arrest, the defendant was taken to the juvenile detention center at New Haven,

---

[3] That violation of probation warrant was unrelated to the present case.

at which time he was informed of his constitutional and statutory rights, including the right to remain silent and the right to counsel.

After receiving the victim's cell phone information, the police traced her cell phone to Hargrove, who, along with Morrison, related to the police what the defendant had told them about the incident involving the victim. The police procured a search warrant for Campbell's cell phone and accessed the voice mail message that the defendant had left for Campbell. On the basis of this evidence, a warrant was issued for the defendant's arrest in connection with the victim's death. Following his arrest, the defendant was charged with, inter alia, felony murder, first degree manslaughter and first degree robbery. Thereafter, the case automatically was transferred from the juvenile court docket to the regular criminal docket[4] in accordance with General Statutes § 46b-127.[5] Following a jury trial, the jury found the defendant guilty of those charges.[6] This appeal followed.

I

The defendant first claims that the trial court improperly allowed the state to introduce into evidence certain

[4] "This state has a unified court system. Thus, all criminal and civil matters, including juvenile matters, fall within the subject matter jurisdiction of the Superior Court. [Under General Statutes § 46b-121 (a); see footnote 10 of this opinion] [j]uvenile matters are comprised of a civil session and a criminal session; all proceedings concerning delinquent children are heard in the criminal session for juvenile matters." *State* v. *Ledbetter*, 263 Conn. 1, 4 n.9, 818 A.2d 1 (2003).

[5] General Statutes § 46b-127 provides in relevant part: "(a) The court shall automatically transfer from the docket for juvenile matters to the regular criminal docket of the Superior Court the case of any child charged with the commission of a capital felony, a class A or B felony or a violation of section 53a-54d, provided such offense was committed after such child attained the age of fourteen years . . . ."

[6] The defendant also was charged with second degree kidnapping and a second count of felony murder. At the conclusion of the state's case, however, the trial court granted the defendant's motion for a judgment of acquittal as to those two charges.

statements that he had made to Allen London, a juvenile detention facility officer. Specifically, the defendant claims that the statements were obtained in violation of § 46b-137 because he provided those statements without the presence of a parent or guardian and without first having been advised of his right to counsel, of his right to refuse to make any statements and of the possibility that any statements he made could be used in the case against him. In connection with this claim, the defendant asks us to overrule our determination in *State* v. *Ledbetter*, 263 Conn. 1, 11, 18, 818 A.2d 1 (2003), that the protections of § 46b-137 (a) do not apply when a juvenile is tried in criminal rather than juvenile court. In support of his claim that *Ledbetter* was wrongly decided, the defendant asserts that, in that case, we failed to analyze § 46b-137 (a) in relation to other key statutory provisions, in particular, the definitions of the terms "delinquent" and "delinquent act" in General Statutes (Rev. to 2003) § 46b-120.[7] The defendant further asserts that our interpretation was inconsistent with the legislature's intent generally to protect children. We reject the defendant's invitation to overrule our holding in *Ledbetter*.[8]

The following additional facts and procedural history are necessary to our resolution of the defendant's claim.

---

[7] General Statutes (Rev. to 2003) § 46b-120 provides in relevant part: "The terms used in this chapter shall, in its interpretation and in the interpretation of other statutes, be defined as follows . . . (6) a child may be convicted as 'delinquent' who has violated (A) any federal or state law or municipal or local ordinance, other than an ordinance regulating behavior of a child in a family with service needs, (B) any order of the Superior Court, or (C) conditions of probation as ordered by the court . . . (11) 'delinquent act' means the violation of any federal or state law or municipal or local ordinance, other than an ordinance regulating the behavior of a child in a family with service needs, or the violation of any order of the Superior Court . . . ."

[8] We note preliminarily that the state maintains only that we should not overrule *Ledbetter*. The state has not raised any claim that § 46b-137 (a) is inapplicable because London did not interrogate or otherwise question the defendant. See part II of this opinion.

Prior to trial, the defendant filed a motion to suppress the statements that he had made to London. After conducting an evidentiary hearing on the defendant's motion, the trial court issued a memorandum of decision that contains the following relevant factual findings. "On October 27, 2004 . . . London, a classification program officer at the detention facility [at which the defendant was then being held], answered a telephone call from the defendant's mother [Tonya Canady] and, pursuant to policy, disconnected the call and then immediately called back [the telephone number on record at the facility for the defendant's mother]. The defendant's mother . . . sounded 'extremely concerned,' telling London that she needed to 'talk to [her] baby.' [She would not] say why she wanted to talk to her son, although when asked by London if someone had passed away, she responded 'no.' London had asked this question because it seemed urgent.

"London did bring the defendant to the office, gave the [tele]phone to the defendant, and told the defendant that his mother wanted to talk to him. The defendant sat at London's desk with London sitting two to three feet away. The conversation between the defendant and his mother lasted for a few minutes. The conversation was neither tape-recorded nor monitored. London did not hear much of what the defendant said and could not hear the defendant's mother at all.

"When the conversation between the defendant and his mother ended, the defendant appeared to London to be distraught and very scared, with a somber look on his face. London asked the defendant, 'are you okay?' The defendant responded that his mother had just told him that ten detectives [came to] his home [the previous night] and that 'they think [he] killed that lady last week.' The defendant stated that, while walking with his cousin in West Haven, he had witnessed a man beating a woman. The defendant stated that he had on

boots so he could not run when the man ordered him to come over there. The man told the defendant to hit the woman, who was kneeling, so the defendant kicked her. At this point, London told the defendant not to say anything else because he felt the defendant was beginning to incriminate himself."[9]

In its memorandum of decision, the trial court denied the defendant's motion to suppress. In particular, the court concluded, in accordance with our holding in *State* v. *Ledbetter*, supra, 263 Conn. 1, that § 46b-137 (a) does not apply when a juvenile is tried as an adult in criminal court. On appeal, the defendant contends that we should overrule *Ledbetter* because it represents a misinterpretation of § 46b-137 (a).

Our determination in *Ledbetter* that the protections of § 46b-137 (a) do not extend to cases involving trials in criminal court was predicated on the terminology that the legislature used for purposes of that statutory subsection. We relied, in particular, on the language of § 46b-137 (a) that provides that any statement made by a child to a police officer or juvenile court official shall be "inadmissible *in any proceeding concerning the alleged delinquency* of the child" making the statement. (Emphasis added; internal quotation marks omitted.) Id., 12. We reasoned that, because § 46b-137 (a) applies only to proceedings that concern a child's alleged delinquency, and " 'all proceedings concerning delinquent children' " are heard in juvenile court; id., 12–13; the trial of a juvenile defendant in criminal court "cannot be characterized as a proceeding '*concerning the alleged delinquency*' of a child that falls within the purview of . . . § 46b-137 (a)." (Emphasis in original.) Id., 13.

The defendant contends, however, that the interpretation of § 46b-137 (a) that this court adopted in *Ledbet-*

---

[9] Juvenile detention center policy requires an officer to advise a detainee to stop speaking when, as in the present case, he begins to incriminate himself.

*ter* is inconsistent with the definitions of the terms "delinquent act" and "delinquent" in General Statutes (Rev. to 2003) § 46b-120. Because a "delinquent act" includes a violation of state law; General Statutes (Rev. to 2003) § 46b-120 (11); and a child may be convicted as a "delinquent" if he violates such a law; General Statutes (Rev. to 2003) § 46b-120 (6); the defendant contends that a violation of the felony murder or the robbery statutes constitutes a delinquent act. The defendant claims, therefore, that his trial on those charges must be considered a proceeding concerning a delinquent child that falls within the scope of § 46b-137 (a), even though he was tried in criminal court. We are not persuaded by the defendant's claim. As we observed in *Lebdetter*, under General Statutes § 46b-121,[10] the legislature has mandated that all proceedings concerning delinquent children shall be conducted in *juvenile court. State* v. *Ledbetter*, supra, 263 Conn. 12–13. Thus, in accordance with *Ledbetter*, the defendant's trial in *criminal court* cannot be considered a proceeding concerning a delinquent child, and, consequently, it falls outside the scope of § 46b-137 (a). Accordingly, we

[10] General Statutes § 46b-121 provides in relevant part: "(a) (1) Juvenile matters in the civil session include all proceedings concerning uncared-for, neglected or dependent children and youth within this state, termination of parental rights or children committed to a state agency, matters concerning families with service needs, contested matters involving termination of parental rights or removal of guardian transferred from the Probate Court and the emancipation of minors, but does not include matters of guardianship and adoption or matters affecting property rights of any child or youth over which the Probate Court has jurisdiction, except that appeals from probate concerning adoption, termination of parental rights and removal of a parent as guardian shall be included.

"(2) Juvenile matters in the criminal session include all proceedings concerning delinquent children within this state. . . ."

Although, in *Ledbetter*, we relied on a prior version of § 46b-121, namely, the version in effect in 1996, when the defendant in *Ledbetter* committed the crimes with which she was charged; see *State* v. *Ledbetter*, supra, 263 Conn. 5, 12; we refer to the current revision in the interest of simplicity because the relevant language in the prior version and the current revision is identical in all material respects.

reject the defendant's assertion that it is reasonable to construe the phrase "any proceeding concerning the alleged delinquency of the child" in § 46b-137 (a) as including proceedings in criminal court.

Furthermore, *Ledbetter* was decided more than six years ago, and the legislature has taken no steps to amend § 46b-137 (a) in response to our holding in that case.[11] "[A]lthough legislative inaction is not necessarily legislative affirmation . . . we . . . presume that the legislature is aware of [this court's] interpretation of a statute, and that its subsequent nonaction may be understood as a validation of that interpretation." (Internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 427–28, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005).

The defendant also contends that our interpretation of § 46b-137 (a) in *Ledbetter* is inconsistent with the primary purpose underlying the enactment of that statute, namely, "to provide needed protection to children who are subjected to questioning by the police." *State* v. *Ledbetter*, supra, 263 Conn. 16. As the defendant maintains, those rights are no less implicated when a juvenile is tried in criminal court than when he is tried in juvenile court. Nevertheless, as we explained in rejecting the identical claim in *Ledbetter*, "[w]e agree, of course, that limiting the scope of § 46b-137 (a) to proceedings in juvenile court necessarily will deprive some children of the protections to which they otherwise would be entitled under § 46b-137 (a). To avoid this result, however, the defendant [in *Ledbetter*] would have us construe the words, 'in *any proceeding concerning the alleged delinquency of the child*' . . . to

---

[11] Although the legislature amended § 46b-137 (a) in 2009; see Public Acts, Spec. Sess., September, 2009, No. 09-7, § 75; those amendments do not relate to our holding in *Ledbetter* that the provisions of that statutory subsection do not apply to cases in which the state seeks to use a defendant's confession in criminal rather than juvenile court.

mean in *any proceeding concerning the child*. We may not disregard the words 'the alleged delinquency of,' because '[w]e presume that the legislature had a purpose for each sentence, clause or phrase in a legislative enactment, and that it did not intend to enact meaningless provisions.' . . . *Gipson* v. *Commissioner of Correction*, [257 Conn. 632, 647, 778 A.2d 121 (2001)]. More significantly, ignoring those words materially would alter the plain import of § 46b-137 (a), thereby frustrating the legislative policy decision to limit its applicability. Such a result would be inconsistent with our responsibility 'to interpret the law, not to make it.' *Office of Consumer Counsel* v. *Dept. of Public Utility Control*, 246 Conn. 18, 43 n.24, 716 A.2d 78 (1998); see also *State* v. *Desimone*, 241 Conn. 439, 455, 696 A.2d 1235 (1997) (in absence of compelling reason, court will not impute to legislature intent that is contrary to plain statutory language)." (Citation omitted; emphasis in original.) *State* v. *Ledbetter*, supra, 16–17. This linguistic analysis, which recognizes that the legislature expressly limited the applicability of the protections afforded juveniles under § 46b-137 (a), is no less persuasive today than it was when we decided *Ledbetter*.

We therefore reject the defendant's claim that *Ledbetter* should be overruled. Accordingly, the trial court properly concluded that § 46b-137 (a) did not bar the state from introducing into evidence the statements that the defendant had made to London.

II

The defendant also claims that the trial court improperly denied his motion to suppress the statements that he made to London because London had failed to advise him of his *Miranda* rights prior to asking him, "are you okay?" We reject the defendant's claim because the trial court properly determined that London did not subject the defendant to interrogation for purposes of *Miranda*,

and, therefore, the defendant was not entitled to an advisement of his *Miranda* rights prior to making his statements to London.

Before addressing the merits of the defendant's claim, we set forth the applicable standard of review and governing legal principles. "It is well established that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination. *Miranda* v. *Arizona*, [supra, 384 U.S. 444]. Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . .

"A defendant in custody is subject to interrogation not only in the face of express questioning by police but also when subjected to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . *Rhode Island* v. *Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). Whether a defendant in custody is subject to interrogation necessarily involves determining first, the factual circumstances of the police conduct in question, and second, whether such conduct is normally attendant to arrest and custody or whether the police should know that such conduct is reasonably likely to elicit an incriminating response." (Citations omitted; internal quotation marks omitted.) *State* v. *Mullins*, 288 Conn. 345, 361–62, 952 A.2d 784 (2008). "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions,

the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (Emphasis in original; internal quotation marks omitted.) *State* v. *Canales*, 281 Conn. 572, 588, 916 A.2d 767 (2007), quoting *Rhode Island* v. *Innis*, supra, 301–302.

"As a general matter, the standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen [however] a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set [forth] in the memorandum of decision . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Mullins*, supra, 288 Conn. 362–63. "[T]he ultimate determination . . . of whether a defendant already in custody has been subjected to interrogation . . . presents a mixed question of law and fact over which our review is plenary, tempered by our scrupulous examination of the record to ascertain whether the findings are supported by substantial evidence." Id., 364.

The state does not dispute that the defendant was in custody at the time he made his statements to London. It also is undisputed that London did not advise the defendant of his *Miranda* rights before the defendant made those statements. The sole issue on appeal, there-

fore, is whether the defendant was subjected to interrogation by London when the defendant made his statements. The defendant claims that, because his statements were made in response to London's inquiry, "are you okay," he necessarily was interrogated for purposes of *Miranda*. We disagree.

The defendant misperceives the *Miranda* interrogation requirement. As the trial court concisely explained in its memorandum of decision on the defendant's motion to suppress, "the statements in question were not the result of conduct designed to elicit incriminating responses. London was unaware of the murder investigation involving the defendant and had no intent to question the defendant. The question was asked after London had spoken to the defendant's mother, who seemed extremely concerned and stated that she had to talk to her baby. London had been present during the telephone conversation between the mother and the defendant, subsequent to which the defendant appeared distraught and very scared with a somber look on his face. These events naturally evoked the inquiry, 'are you okay,' which was not an interrogation. Certainly, the question was brief and neutral. The statements made by the defendant in response were volunteered. The defendant's statements were the unforeseeable result of an innocuous question. London could not have known that his question was reasonably likely to elicit an incriminating response. Based on the totality of the surrounding circumstances, the defendant was not subjected to interrogation, and his statements were volunteered."

The trial court's findings of fact are fully supported by the evidence that was adduced at the suppression hearing. There is nothing in the record to indicate that London had any reason to believe that his innocuous inquiry into the defendant's emotional state following

the defendant's strong negative reaction to his conversation with his mother would evoke an incriminating response of any kind. In such circumstances, *Miranda* is inapplicable because, as the trial court explained, the defendant volunteered the statements at issue, and they were not elicited or prompted by any actions or words of the official to whom the statements were made. Accordingly, under the facts presented, the trial court properly determined that the defendant's statements were admissible even though he had not been advised of his *Miranda* rights prior to making those statements.

### III

The defendant next claims that the trial court improperly allowed the state to elicit certain testimony from Bryant under the adoptive admission exception to the hearsay rule. We also reject this claim.

The following facts and procedural history are relevant to our resolution of this claim. The state's evidence established that the defendant and Campbell had walked to Bryant's home following the defendant's assault of the victim. Bryant let Campbell in through a window, and, although the defendant remained outside, he was only a few feet away from those who were inside, namely, Bryant, Campbell and Howell, who was spending the night at Bryant's home. The defendant was speaking to Howell through the open window, and Campbell heard them speaking. At some point, Campbell interrupted their conversation, stating, "I had nothing to do with that." Over defense counsel's objection, the trial court permitted Bryant to testify that Campbell then proceeded to explain that, at some point during the victim's encounter with the defendant and Campbell, the defendant "started messing with her . . . ." Bryant further testified that Campbell had stated that the victim was screaming and grabbed the defendant,

who hit her. Bryant stated that Campbell had explained that, before he and the defendant arrived at Bryant's home, the defendant had thrown the victim's clothes in the woods and had taken her cell phone and cigarettes. According to Bryant, the defendant's only response to Campbell's comments was that Campbell was "overreacting."[12] Finally, Bryant testified that, although she and Campbell had been talking to each other at the same time that Howell and the defendant were speaking to one another, she, Howell and the defendant all were listening to Campbell when he recited the facts relevant to the incident involving the victim.

In concluding that Bryant's testimony concerning Campbell's statements about the defendant's assault of the victim was admissible under the hearsay exception for adoptive admissions, the trial court determined that the defendant had been in close enough proximity to Campbell to have heard his statements. Although the court observed that, at times, there were two conversations occurring simultaneously, it also observed that those conversations had terminated when Campbell was speaking about the incident involving the victim. The court further found that all of the parties had been talking in "normal tones" and standing only "between

[12] We note that, in seeking to introduce Campbell's statements as adoptive admissions, the state's attorney called Bryant to testify in connection with an offer of proof that the state's attorney made outside the presence of the jury. During the offer of proof, Bryant indicated that the defendant had not responded at all to Campbell's recitation of the events surrounding the defendant's assault of the victim. At the conclusion of the offer of proof, the trial court overruled defense counsel's objection to Bryant's testimony. At trial, however, Bryant modified the testimony that she had given during the offer of proof, explaining that the defendant had, in fact, responded to Campbell's statements by indicating that Campbell was overreacting. Despite the change in testimony, however, the trial court did not reconsider its earlier decision to permit the state to elicit Bryant's testimony regarding Campbell's statements under the theory that those statements constituted adoptive admissions.

two feet and four feet away" from each other. Finally, the court explained that Campbell's factual statements were sufficiently accusatory that one reasonably would have expected the defendant to have denied those facts if they were false.

The following principles govern our analysis of the defendant's claim. "To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. They require determinations about which reasonable minds may not differ; there is no 'judgment call' by the trial court, and the trial court has no discretion to admit hearsay in the absence of a provision providing for its admissibility. . . .

"We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . In other words, only after a trial court has made the legal determination that a particular statement is or is not hearsay, or is subject to a hearsay exception, is it vested with the discretion to admit or to bar the evidence based [on] relevancy, prejudice, or other legally appropriate grounds related to the rule of evidence under which admission is being sought. For example, whether a statement is truly spontaneous as to fall within the spontaneous utterance exception will be reviewed with the utmost deference to the trial court's determination." (Citations omitted.) *State* v. *Saucier*, 283 Conn. 207, 218–19, 926 A.2d 633 (2007).

Further, "[t]he law regarding out-of-court statements admitted for the truth therein is well settled. An out-

of-court statement offered to establish the truth of the matter asserted is hearsay. . . . As a general rule, such hearsay statements are inadmissible unless they fall within a recognized exception to the hearsay rule." (Internal quotation marks omitted.) *State* v. *Pierre*, 277 Conn. 42, 64, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006). Section 8-3 of the Connecticut Code of Evidence provides that certain statements are "not excluded by the hearsay rule, even though the declarant is available as a witness," including "(1) . . . [a] statement that is being offered against a party and is . . . (B) a statement that the party has adopted or approved . . . ." The commentary to § 8-3 (1) of the Code of Evidence provides that "the common-law hearsay exception for tacit admissions, under which silence or a failure to respond to another person's statement may constitute an admission . . . is carried forward in Section 8-3 (1) (B)." (Citations omitted.)

"When a party's conduct indicates that the party assents to or adopts a statement made by another person, the statement is admissible against the party. . . . Specifically, [when] hearsay accusations are sought to be introduced as evidence against a defendant in a criminal proceeding on [the ground] that the hearsay was adopted by the defendant . . . the trial court must first determine that the asserted adoptive admission be manifested by conduct or statements [that] are unequivocal, positive, and definite in nature, clearly showing that in fact [the] defendant intended to adopt the hearsay statements as his own. . . . Generally, statements made within the accused's hearing, which are relevant and material, to which he makes no reply, may be given in evidence as indicative of conduct on his part, when the circumstances show that he heard, understood and comprehended the statement[s], and the facts are known to him and he had the opportunity to speak and

the circumstances naturally called for a reply from him. . . . In other words, under such circumstances, and if no other explanation is equally consistent with [the defendant's] silence, the defendant's silence may be construed as an admission of guilt . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Pierre*, supra, 277 Conn. 72–73.

In the present case, the defendant contends that the trial court's factual findings with regard to the defendant's ability to hear and understand Campbell's statements were clearly erroneous. The defendant further contends that he never engaged in any conduct that indicated that he intended to adopt Campbell's statements and that there were other explanations aside from guilt that were equally consistent with his response. We conclude that the trial court reasonably determined that the defendant had heard and understood Campbell's statements. Although the defendant contends that he was engaged in a separate conversation with Howell when Campbell was describing the incident involving the victim to Bryant, thereby rendering it impossible for him to hear and understand what Campbell was saying, Bryant's testimony fully supported the trial court's contrary finding.

We also reject the defendant's assertion that the trial court abused its discretion in failing to find that there were other explanations aside from guilt that were equally consistent with the defendant's response. Because the evidence supported the trial court's finding that the defendant had listened to everything Campbell had to say, in light of the highly incriminating nature of Campbell's statements, it was reasonable for the trial court to find that, if the statements were not true, the defendant would have denied them. In other words, no other explanation aside from guilt was equally consistent with the defendant's response.

The defendant further contends that, because he did not remain silent in response to Campbell's statements, it was improper for the trial court to treat his reaction as an adoptive admission. According to the defendant, in light of the fact that he stated that Campbell was overreacting to what had occurred between the defendant and the victim, the court abused its discretion in permitting the state to elicit Bryant's testimony regarding Campbell's statements and the defendant's response thereto. We disagree. Although the defendant's characterization of Campbell's statements as an overreaction rendered those statements somewhat less incriminating than they would have been if the defendant had said nothing, we cannot say that the court reasonably could not have concluded that Bryant's testimony regarding the challenged statements was admissible. As we explained, if the defendant had not violently assaulted the victim, one reasonably would have expected the defendant to deny Campbell's statements. The defendant, however, did not deny his involvement with the victim; rather, he stated only that Campbell's version of the events was exaggerated or overstated. Because that response did not constitute a denial, and because the incriminating nature of Campbell's statements naturally would have prompted such a denial by the defendant if he had not engaged in at least some of the conduct attributed to him, the court was within its discretion in permitting the state to elicit Bryant's testimony regarding Campbell's statements. See, e.g., *Dant* v. *Commonwealth*, 258 S.W.3d 12, 18 (Ky. 2008) (accusation made in defendant's presence that he had abused his girlfriend's daughter and defendant's response that he was tired of supporting child who was not his own constituted adoptive admission because defendant could have denied accusation but "chose not to . . . even though it was made under circumstances that

would normally call for his denial" [internal quotation marks omitted]); *Commonwealth* v. *Williams*, 450 Mass. 645, 650–51, 880 N.E.2d 768 (2008) (statement by codefendant to third party that defendant and codefendant were beating someone up constituted adoptive admission when defendant responded " '[y]o, chill, chill,' " because defendant could have been expected to deny statement if it was untrue and defendant's statement was not denial).

Finally, even if we assume, arguendo, that the trial court abused its discretion in permitting the state to elicit Bryant's testimony, that testimony was harmless because there is no likelihood that it had any bearing on the jury's deliberations.[13] The state's case against the defendant was overwhelming and included eyewitness testimony by Campbell and highly incriminating statements—tantamount to confessions—that the defendant had made to London, Campbell, Bryant, Howell, Morrison and Hargrove. In addition, the state presented evidence establishing that the defendant's DNA had been found on the victim, that the defendant was in possession of the victim's cell phone the morning after she was murdered and that the defendant had left a voice mail message on Campbell's cell phone stating that, if Campbell was questioned about the incident with the victim, he should say that the victim's husband had forced the defendant, at gun point, to kick the victim in the head. In light of the strength of the state's case and the cumulative nature of Campbell's statements, the substance of which the defendant himself repeatedly had acknowledged, the defendant cannot

---

[13] "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Beavers*, 290 Conn. 386, 396–97, 963 A.2d 956 (2009).

establish that the state's use of those statements, even if improper, affected the verdict.[14]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[14] The defendant also contends that the state's attorney engaged in impropriety by eliciting testimony from Bryant as part of the offer of proof that the defendant had said nothing in response to Campbell's statements; see footnote 12 of this opinion; and then, at trial, eliciting testimony from Bryant that the defendant had stated in response to Campbell's statements that Campbell was overreacting. We reject this claim because there is nothing in the record to indicate that the state's attorney knew that Bryant would change her testimony at trial. Furthermore, as we repeatedly have observed, "[t]he touchstone of due process analysis in cases of alleged[ly] [harmful] prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's [actions at trial] so infected [it] with unfairness as to make the resulting conviction a denial of due process." (Internal quotation marks omitted.) *State v. Melendez*, 291 Conn. 693, 714, 970 A.2d 64 (2009). In light of our conclusion that the trial court properly permitted the state to elicit Bryant's testimony concerning Campbell's statements and the defendant's reaction to those statements, the defendant was not prejudiced in any way by the actions of the state's attorney. Accordingly, the defendant's claim of prosecutorial impropriety must fail.

The defendant further claims that the trial court improperly denied his posttrial motions for a new trial and for a judgment of acquittal. In essence, the defendant alleges, in conclusory fashion, that the trial court failed to evaluate the evidence in accordance with the appropriate standard of review in determining that the state had met its burden of proof with respect to each element of the crimes of which he had been found guilty. We reject the defendant's claim because there is nothing in the record to substantiate the claim and because the trial evidence amply supported the jury's verdict.