******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* WILFREDO RAMOS
(SC 19188)

Rogers, C. J., and Palmer, Zarella, Eveleigh, Espinosa, Robinson and Vertefeuille, Js.

*Argued March 25—officially released May 26, 2015*

*Emily Wagner*, assistant public defender, for the appellant (defendant).

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Terence D. Mariani*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ROGERS, C. J. The two issues that we must resolve in this appeal are whether the trial court should have suppressed the statements of the defendant, Wilfredo Ramos, because they were either the product of a custodial interrogation prior to the defendant having been given his *Miranda*[1] warnings or the result of coercion. The defendant appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a),[2] and tampering with physical evidence in violation of General Statutes § 53a-155 (a) (1).[3] Prior to trial, the defendant moved to suppress certain oral statements that he had made to a Waterbury police officer shortly after his apprehension and then to three other officers at the detective bureau of the Waterbury Police Department on the ground that the statements were the result of a custodial interrogation without the defendant having been read his *Miranda* warnings. He also sought to suppress a statement that he made after being given his *Miranda* warnings on the ground that it was the product of coercion. The trial court conducted an evidentiary hearing, after which it denied the defendant's motion. Thereafter, the jury found the defendant guilty of both charges, and the trial court rendered a judgment of conviction in accordance with the jury's verdict. This appeal followed. We conclude that the trial court properly denied the defendant's motion to suppress.

The following evidence that was adduced at the suppression hearing is relevant to our resolution of these claims. During the early morning hours of October 4, 2011, the victim, Linda Graveline, was stabbed to death at her apartment in Waterbury. Two of the victim's neighbors observed the victim immediately after the attack and telephoned the Waterbury police. Lieutenant Michael Slavin arrived at the victim's apartment in response to the call, at which point he learned the defendant's name and his potential involvement with the incident from the witnesses' statements. Slavin also contacted the detective bureau and spoke to Sergeant Daniel Ferrucci about the incident, but did not mention the defendant's name.

Thereafter, at approximately 3:05 a.m. on October 4, 2011, another telephone call was made to the police department reporting an incident at the victim's apartment. The caller, later identified as the defendant, stated that he had been injured, and that someone named "Kardeem" was involved in the incident. At 7:10 a.m., the defendant again telephoned the police and reported that he had sustained injuries at the victim's apartment and that he had information about the third-party perpetrator of the incident. The police officer who spoke with the defendant during the second call, upon learning that the defendant was injured, asked him several times whether he required medical attention. At that point,

although the police believed that the defendant had some involvement with the victim's murder, they were unsure whether he was a suspect or a victim himself. The defendant refused to state whether he required medical assistance, would not provide his name or location, and abruptly terminated the telephone call. Ferrucci and two other police officers were able to track the defendant by his cell phone usage, and they drove in an unmarked police vehicle to a street nearby the victim's apartment where they located the defendant. Ferrucci exited the vehicle and, seeing that the defendant's clothing was discolored with what appeared to be blood, advised the defendant that they were conducting an ongoing investigation. Ferrucci asked the defendant his name, whether he wanted medical attention, and, with regard to his injuries, "how did it happen?" The defendant responded that his name was Wil. He refused medical treatment for cuts to his left hand and lower left leg, and stated that "there was a struggle" at the victim's apartment. The defendant then agreed to cooperate with the officers and go to the police station. The officers patted the defendant down and handcuffed him pursuant to standard police policy and for officer safety, and drove him to the police department in the unmarked police car. The drive to the police department lasted approximately three to five minutes, during which neither the defendant nor the officers spoke to one another. Upon arriving at the police department, the officers placed the defendant in an interview room, approximately ten feet by ten feet, inside the detective bureau. Immediately thereafter, the officers removed the handcuffs from the defendant.

Once the defendant was seated in the interview room, Detectives George Tirado, Jr., and Orlando Rivera were assigned to interview him. Rivera testified that by that time, he knew that the victim had been stabbed multiple times and that she was deceased. Rivera had also learned that the victim's neighbors who had initially contacted the police department had seen the defendant in the victim's apartment, covered in blood and holding a knife. Rivera also knew that the defendant had told the victim's neighbors that the victim was okay and that he had then left the victim's apartment. Rivera was aware that shortly after the neighbors' telephone call to the police and again at approximately 7 a.m., the police department had received telephone calls from a man named Wil who stated that he had witnessed a homicide and that he was injured as well. Accordingly, before he began to speak with the defendant, Rivera was uncertain whether the defendant was a suspect or a victim.

Upon entering the interview room with Tirado, Rivera noted that the defendant was not shackled or handcuffed but was sitting freely, and Rivera immediately noticed that the defendant was covered in blood, with a large pool of blood by his left knee. Rivera asked him,

"are you hurt, are you okay?" Tirado also asked the defendant whether "he was okay" and whether he "needed medical attention." Tirado testified that he "basically said, 'what happened to you?' "[4] The defendant replied, "I stabbed myself," and pulled his pants down to show the detectives an injury on his knee. Rivera and Tirado thereafter asked the defendant whether he wanted medical attention, to which the defendant responded that he did not and that he needed only tissues for his wound. Rivera and Tirado left the interview room to obtain a first aid kit, medical gauze and tape. At that point, they decided that it "would be best" to read the defendant his *Miranda* warnings. Upon returning with the first aid kit, Tirado read the defendant his *Miranda* warnings from an advisement card for the first time. Tirado testified that the defendant responded orally that he understood the rights that Tirado read to him. Tirado showed the defendant the advisement card for the defendant to read and initial. The defendant then informed the detectives that he had obtained his General Educational Development certificate and could read, but was unable to see the writing on the advisement card or type a sworn statement because he suffered from Lupus, a disease that affected his eyesight and his ability to read fine print. The defendant explained to Rivera and Tirado, however, that he knew his rights because he had been arrested for numerous felonies in the past and was thus "very familiar" with the legal system. Rivera further testified that the defendant, upon being asked if he understood his rights and wanted to waive them, responded, "[Y]es, I understand my rights . . . yes, I want to give up my rights. I want to cooperate with you guys."

After the detectives were satisfied that the defendant had understood and waived his rights, they asked him about the circumstances of the victim's death. The defendant responded that he had spoken with the victim about his belief that she was cheating on him. On the morning of her death when he confronted her about this suspicion, she smirked at him and he believed that she was laughing at him. The defendant became enraged when the victim did not deny his allegations, grabbed a knife and began to stab her in her torso. Rivera testified that the defendant willingly explained the incident to the officers and that his interview was not contentious. Tirado similarly testified that his interaction with the defendant was, at all times, cordial and amicable.

After the defendant had confessed to stabbing the victim, Rivera and Tirado left the interview room to inform Lieutenant Slavin that the defendant was unable to see the print on the advisement card in order to sign his waiver of rights. Slavin was concerned that the defendant was unable to read the advisement card and returned to the interview room with Tirado and Rivera to evaluate the defendant's physical condition and to ascertain whether the defendant understood his rights.

In Slavin's presence, Tirado read the defendant his *Miranda* warnings a second time. Slavin then asked the defendant if he was coherent and truly understood his rights, and Slavin testified that the defendant appeared to understand Slavin and that he responded appropriately. Slavin testified that the defendant appeared to be very calm. The defendant thereafter, in Slavin's presence, provided for the second time details about his involvement in the circumstances leading to the victim's death.

The record reveals the following procedural history and evidence that was adduced at the suppression hearing. Prior to trial, the defendant filed a motion and then an amended motion to suppress statements he made to Sergeant Ferrucci, Detectives Rivera and Tirado, and Lieutenant Slavin on the grounds that he had not knowingly and voluntarily waived his right to remain silent and that his confession that he killed the victim was not voluntary. On March 20, 2013, and March 26, 2013, the trial court, *Crawford, J.*, held a hearing, in which the four officers testified, on the defendant's amended motion to suppress his confession. Defense counsel claimed that, although Tirado, Rivera and Slavin testified that the defendant had verbally confessed to them, that confession simply did not occur. In the alternative, defense counsel contended that the state failed to prove that the defendant understood his waiver of rights and voluntarily confessed. The state responded that the evidence sufficiently demonstrated that the defendant had twice been informed of his rights, affirmed his understanding of these rights, and voluntarily waived these rights. It further contended that the defendant had not been subjected to custodial interrogation prior to receiving his rights because the innocuous questions such as "are you hurt, are you okay?" were not designed to elicit incriminating responses about the crime.

At the conclusion of testimony, the trial court found that there was no evidence that Ferrucci, Rivera, Tirado or Slavin had attempted to elicit incriminating testimony before they issued the defendant his *Miranda* warnings. The trial court further found that before issuing the defendant's *Miranda* warnings, the officers knew only that the defendant had made some attempt to contact the police department, and that they were uncertain whether the defendant was a victim or a suspect. The trial court specifically found that, "once [the officers] discovered that [the defendant] was covered with blood and recognized that he was in some way connected, although they did not know at that time if he had been a victim or a suspect . . . they felt the [*Miranda*] warnings were appropriate. There was an initial inquiry to determine [the defendant's] competency since it was determined that he had difficulty reading the form, which is the explanation as to why he did not sign it. But the testimony also indicated that he volunteered certain information." The trial court

concluded that the defendant had not been subjected to custodial interrogation because he was not subjected to questioning intended to elicit an incriminating response.

The trial court went on to conclude that all of the defendant's statements, made both before and after the police issued his *Miranda* warnings, were voluntary. "All the evidence indicates that there were no confrontations, that the defendant cooperated, [and that] he, essentially, volunteered his version of the events. There [is no] evidence that at any time he invoked the right to remain silent. And there [is no] evidence that he did not understand the rights that were given." The trial court thus denied the defendant's motion to suppress.

On appeal, the defendant first claims that the trial court improperly found that he was not subjected to custodial interrogation before receiving the *Miranda* warnings. The defendant contends that he was interrogated because Ferrucci, Rivera and Tirado knew that he was involved in the stabbing death of the victim. Specifically, they knew that witnesses had identified the defendant as being the victim's boyfriend, that the witnesses had heard the victim screaming and had then seen the defendant, covered in blood, holding a knife in the victim's apartment. The witnesses heard the defendant say that the victim was okay before he fled the scene. The defendant asserts that, "[w]hen posed to a suspect who is covered in blood and who has been identified by witnesses as the perpetrator of a stabbing, the question 'what happened to you?' is reasonably likely to elicit an incriminating response." We disagree.

Before addressing the merits of the defendant's claim, we set forth the applicable standard of review and governing legal principles. "Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda:* (1) the defendant must have been in custody;[5] and (2) the defendant must have been subjected to police interrogation." (Footnote added; internal quotation marks omitted.) *State* v. *Jackson,* 304 Conn. 383, 416, 40 A.3d 290 (2012). "A defendant in custody is subject to interrogation not only in the face of express questioning by police but also when subjected to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . Whether a defendant in custody is subject to interrogation necessarily involves determining first, the factual circumstances of the police conduct in question, and second, whether such conduct is normally attendant to arrest and custody or whether the police should know that such conduct is reasonably likely to elicit an incriminating response. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts

to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Canady*, 297 Conn. 322, 335–36, 998 A.2d 1135 (2010).

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Jenkins*, 298 Conn. 209, 222, 3 A.3d 806 (2010). "[T]he ultimate determination . . . of whether a defendant already in custody has been subjected to interrogation . . . presents a mixed question of law and fact over which our review is plenary, tempered by our scrupulous examination of the record to ascertain whether the findings are supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *Canady*, supra, 297 Conn. 336.

In the present case, we conclude after thoroughly reviewing the record and the trial court's findings, that the trial court properly concluded that the purpose of the questioning of the defendant prior to the police giving him his *Miranda* warnings was to inquire into the defendant's general welfare, not to elicit an incriminating response. This conclusion is supported by the facts in the record. First, there is nothing in the record to indicate that the officers had any reason to believe that asking, "are you hurt, are you okay?" or, "what happened to you?" would evoke an incriminating response. See id., 337. Although the question, "what happened to you?" could constitute interrogation in certain contexts, under the circumstances of this case where the defendant was covered in blood, and still bleeding, the police should not have been expected to know their questions would have elicited an incriminating response as opposed to a response as to whether he needed medical attention. Furthermore, the defendant's response, "I stabbed myself," is a statement that relates to the cause of his injuries, and is not an admission of guilt. We thus reject the defendant's claim because the trial court properly concluded that Ferrucci, Rivera, and Tirado did not subject the defendant to interrogation before he was given his *Miranda* warnings.[6]

The defendant also claims that his statements should have been suppressed because they were the product of police coercion. The defendant claims that his con-

fession was coerced because, among other things, he was interrogated continuously for five hours in a windowless room without food, water, rest, or legal representation, and that he was physically weakened by his knife wounds and by an underlying medical condition. We are not persuaded.

"Whether a confession is involuntary because it was coerced rests upon factual determinations regarding the circumstances surrounding the defendant's confession. . . . Although the ultimate question of voluntariness is one of law over which our review is plenary, the factual findings underpinning that determination will not be overturned unless they are clearly erroneous. . . . The determination of whether a confession is voluntary must be based on a consideration of the totality of circumstances surrounding it . . . including both the characteristics of the accused and the details of the interrogation. . . . Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. . . . Under the federal constitution . . . coercive police activity is a necessary predicate to the finding that a confession is not voluntary . . . . The state is required to prove the voluntariness of a confession by a preponderance of the evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Jackson*, supra, 304 Conn. 419–20.

We conclude that the trial court's finding that the defendant voluntarily confessed was supported by substantial evidence. The defendant was forty-three years old at the time of his confession. He had obtained his General Educational Development certificate, was able to read, and was twice read his *Miranda* rights by Detective Tirado. The defendant appeared calm and cooperative throughout his interview. Once he received his *Miranda* warnings, he stated repeatedly that he understood his rights and the implications of waiving them. In contrast, there is no evidence in the record that the defendant had requested food, rest or legal representation, that he was a victim of physical punishment, or that he confessed only after being held for five hours. On the basis of this evidentiary record, we agree with the trial court that the defendant's confession was voluntary.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[3] General Statutes § 53a-155 (a) provides in relevant part: "A person is

guilty of tampering with or fabricating physical evidence if, believing that an official proceeding is pending, or about to be instituted, he: (1) Alters, destroys, conceals or removes any record, document or thing with purpose to impair its verity or availability in such proceeding . . . ."

[4] The factual record of Tirado's question is unclear and the trial court made no specific finding of the actual question that Tirado asked the defendant.

[5] The state does not contest that the defendant, upon arriving at the police department and being placed in the interview room of the detective bureau, was in custody. We therefore proceed to consider whether the defendant was subjected to interrogation while in custody.

[6] Because we conclude that the trial court properly denied the defendant's motion to suppress on the grounds that the defendant was not subjected to custodial interrogation, we need not address the defendant's second unpreserved claim, that his confession should have been suppressed because it was involuntarily given in response to an improper "question-first" interrogation tactic in violation of *Missouri* v. *Seibert*, 542 U.S. 600, 604, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004). The test enunciated in *Seibert* applies when a defendant is first interrogated without receiving *Miranda* warnings, then read his *Miranda* rights after he admits something incriminating, and then interrogated a second time with those post-*Miranda* statements offered into evidence. Id., 604–605. In the present case, however, we conclude that the defendant was not subjected to interrogation before he was read his *Miranda* warnings. Thus, absent the first step of the *Seibert* sequence, we need not reach the defendant's second claim.

—————————————————————