******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

## DASHAWN REVELS *v.* COMMISSIONER
## OF CORRECTION
### (AC 46727)

Alvord, Cradle and Westbrook, Js.

*Syllabus*

The petitioner appealed, following the granting of his petition for certification to appeal, from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. The petitioner claimed that the habeas court improperly concluded that his right to the effective assistance of counsel was not violated by his trial counsel. *Held*:

The habeas court properly determined that the petitioner failed to establish deficient performance by his trial counsel in conducting cross-examinations of certain witnesses, as his trial counsel's cross-examinations did not fall below an objective standard of reasonableness considering all of the circumstances.

The habeas court properly determined that the petitioner failed to establish that his trial counsel rendered deficient performance in deciding not to introduce certain cell phone records, as that decision reflected sound trial strategy.

The habeas court properly determined that the petitioner's trial counsel was not ineffective in failing to consult with or present an expert on coerced and false confessions, the petitioner having failed to establish that he was prejudiced as a result of his trial counsel's allegedly deficient performance.

The habeas court properly determined that trial counsel did not render deficient performance in failing to consult with or present the testimony of an expert on crime scene reconstruction.

Argued September 4—officially released December 10, 2024

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Bhatt, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Deren Manasevit*, assigned counsel, for the appellant (petitioner).

*Olivia M. Hally*, deputy assistant state's attorney, with whom, on the brief, were *Paul J. Narducci*, state's attorney, and *Angela R. Macchiarulo*, supervisory assistant state's attorney, for the appellee (respondent).

*Opinion*

ALVORD, J. In this certified appeal, the petitioner, Dashawn Revels, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the habeas court improperly concluded that his right to the effective assistance of counsel was not violated when his trial counsel (1) conducted inadequate cross-examinations, (2) failed to introduce into evidence the petitioner's cell phone records, and (3) failed to consult or present experts on false confessions and crime scene reconstruction. We affirm the judgment of the habeas court.

On the basis of the evidence presented at the petitioner's criminal trial, the jury reasonably could have found the following facts, as set forth by the Supreme Court in the petitioner's direct appeal. "On the night of March 31, 2009, sometime shortly before 11 p.m., the victim, Bryan Davila, was walking on Crystal Avenue, near the Thames River Apartments, a three building complex in New London (apartment complex). A group of approximately eight to nine men [(the group)], including the [petitioner], were walking closely behind him. The victim crossed over from Crystal Avenue to State Pier Road. Most of the men in the group continued walking toward a nearby footbridge to a nearby housing project. Two men in the group, however, one of whom was the [petitioner], remained near the victim. The [petitioner] then ran toward the victim, who was on the sidewalk on State Pier Road in front of a building housing an electrical supply company. When the victim attempted to run, the [petitioner] fired numerous shots at the victim, who fell to the ground. The [petitioner] then fled the scene on foot.

"Immediately after he was shot, the victim called 911. He was unable to communicate with the dispatcher, so she triangulated his location to the closest cell phone tower. She then notified the New London Police Department of the call and the likely location of the victim. When police reported to the area, they found the victim lying face up on the sidewalk, breathing, but unable to communicate, with a nine millimeter semiautomatic pistol near his right hand and his cell phone on the ground nearby, with the call to the 911 dispatcher still connected. After securing the area, some officers remained to assist emergency medical services as they provided treatment to the victim, while others were sent to canvass the neighborhood. The victim was subsequently taken by ambulance to the hospital, where he was pronounced dead at 11:37 p.m. The autopsy later revealed that the victim bled to death from gunshot wounds, one in the abdomen, another in the left buttock, and a grazing wound near the left shoulder blade. Two .22 caliber bullets were recovered from the victim's body. Eight spent .22 caliber shell casings were discovered at the scene. A single, nine millimeter cartridge case was removed from the chamber of the nine millimeter pistol.

"While canvassing the area of the apartment complex, Officer Justin Clachrie was approached by two women, Fidelia Carrillo and her younger sister. Because Carrillo spoke only Spanish, her younger sister translated for her. Carrillo explained to Clachrie that she had seen the shooting from her apartment windows on the fifth floor of 40-46 Crystal Avenue, a building in the apartment complex. Although the building was located approximately 265 feet away from where the victim's body was found, Carrillo had been able to see that the shooter was a black male with braided hair, wearing a green camouflage jacket, a red baseball cap, dark pants and dark tennis shoes. Shortly after Clachrie broadcast

the description of the suspected shooter over the radio, he received news that other officers had located a suspect matching that description. He then asked Carrillo if she and her sister would accompany him to view the suspect, which Carrillo agreed to do.

"Clachrie drove Carrillo and her sister to Home Street in New London, where officers had apprehended the [petitioner]. When Clachrie pulled up at approximately 11:40 p.m., the [petitioner] was standing in the middle of the road, handcuffed and surrounded by uniformed police officers. Clachrie directed the spotlight on his cruiser toward the suspect, at which point Carrillo, with no prompting from Clachrie, exclaimed in Spanish, 'That's him!' The [petitioner] was wearing a camouflage jacket, a red cap, and dark pants.

"The police had apprehended and detained a second suspect, Eric Caple, in the same general vicinity as the [petitioner]. After she had identified the [petitioner], they brought Caple forward to show him to Carrillo. Although Carrillo identified Caple as being present at the murder scene, she hesitated in making the identification and did not evince the same level of 'excitement' that she had displayed when identifying the [petitioner].

"The [petitioner] was taken to the New London Police Department, where his hands and clothes were tested for gunshot residue,[1] and he was interviewed twice by Detective Richard Curcuro. During the first interview,

---

[1] "The results of the gunshot residue tests were inconclusive. They revealed the presence of lead and antimony particles on the victim's palms and the presence of lead on the [petitioner's] left palm and the back of his right hand. A single lead particle was discovered on the right cuff of the [petitioner's] sweatshirt, and no lead particles were discovered on his jacket. On the basis of these results, the state's forensic expert testified that he could not conclude whether either the [petitioner] or the victim had fired a gun on the night of the shooting." *State* v. *Revels*, 313 Conn. 762, 768 n.3, 99 A.3d 1130 (2014), cert. denied, 574 U.S. 1177, 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015).

after he was advised of his rights, the [petitioner] denied being in the area of the shooting. When Curcuro interviewed the [petitioner] for a second time, however, the [petitioner] admitted to being present at the crime scene after being shown still photographs of him taken from video surveillance footage from cameras at one of the buildings in the apartment complex. The [petitioner] admitted that outside the apartment complex, his group had a confrontation with a Hispanic man. The Hispanic male then pulled out a gun and fired shots at the [petitioner's] group. Finally, the [petitioner] told Curcuro that he had fired back at the victim, and then had discarded the gun by throwing it down an embankment near the footbridge as he ran away.[2]

"In a substitute information, the [petitioner] was charged with murder in violation of [General Statutes] § 53a-54a. Following his conviction, the [petitioner's] subsequent motions for a new trial and a judgment of acquittal were denied." (Footnotes in original.) *State* v. *Revels*, 313 Conn. 762, 766–69, 99 A.3d 1130 (2014), cert. denied, 574 U.S. 1177, 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015). The Supreme Court affirmed the judgment of conviction on direct appeal. Id., 785.

On September 30, 2020, the petitioner filed a second amended petition for a writ of habeas corpus, claiming in relevant part that his trial counsel, Attorneys Bruce Sturman and Jennifer Baldwin, provided ineffective

---

[2] "The interviews that Curcuro conducted of the [petitioner] were recorded, and the transcript of the recording indicates that rather than stating, as Curcuro testified, 'I shot back,' the [petitioner] stated that after the victim fired on the [petitioner's] group, '*we* start shooting back.' (Emphasis added.) The state claimed at trial that the recording from which the transcript was taken was garbled, and that the transcriber incorrectly heard the [petitioner] to say 'we' shot back, instead of 'I' shot back. The audio recording of the interviews was played to the jury during trial." *State* v. *Revels*, 313 Conn. 762, 768 n.4, 99 A.3d 1130 (2014), cert. denied, 574 U.S. 1177, 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015).

assistance during his criminal trial.[3] The petitioner alleged that Sturman had been ineffective because he "fail[ed] to consult with and present the testimony of experts on eyewitness identification, crime scene reconstruction and coerced confessions," failed to "adequately cross-examine two of the state's witnesses," and "failed to introduce certain evidence," including the petitioner's cell phone records.

The habeas court, *Bhatt, J.*, conducted a trial on October 19, 2022, and January 11 and May 26, 2023. The petitioner presented the testimony of several witnesses, including Detective Richard Curcuro, Attorney Brian Carlow, and experts Brian Cutler and Peter Valentin. The petitioner was unable to call Sturman as a witness during the habeas trial, but did present the testimony of Baldwin, who had acted as second chair during the petitioner's criminal trial.[4] The petitioner provided and the court admitted several exhibits, including Carrillo's statement to the police, transcripts from the underlying criminal proceeding, surveillance footage, the petitioner's cell phone records, a dashcam video, and a photo replicating what Carrillo could have observed from her apartment the night of the shooting.

On May 31, 2023, the court issued a memorandum of decision denying the petition. As to the petitioner's claim that counsel was deficient in failing to consult with and present certain expert testimony, the habeas court determined that (1) Sturman was not deficient in failing to hire a crime scene reconstruction expert and that the petitioner did not prove prejudice, (2) Sturman's failure to obtain an expert on coerced confessions did not prejudice the petitioner, and (3) Sturman

---

[3] Although the petitioner alleged claims of ineffective assistance of counsel with respect to both Sturman and Baldwin, the petitioner did not appeal the court's rejection of his claims with respect to Baldwin.

[4] Baldwin represented the petitioner at the arraignment. The case was then transferred to part A of the Superior Court in New London. She was not involved in the case again until jury selection.

was not deficient in failing to hire an eyewitness identification expert and that the petitioner did not prove prejudice. The habeas court also rejected the petitioner's claims that counsel did not adequately cross-examine Curcuro and Carrillo because the petitioner failed to prove that Sturman acted deficiently or prejudiced the petitioner in the cross-examination of both witnesses. Lastly, the court rejected the petitioner's claim regarding Sturman's failure to introduce records of the petitioner's cell phone usage the night of the shooting, concluding that Sturman did not render deficient performance and that the petitioner did not prove prejudice. The petitioner thereafter filed a petition for certification to appeal from the habeas court's denial of his writ of habeas corpus, which the habeas court granted. This appeal followed. Additional facts will be set forth as necessary.

We begin by setting forth the relevant standard of review and decisional law that guide our analysis of the petitioner's claims. "The standard of review and law governing ineffective assistance of counsel claims is well settled. The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Historical facts constitute a recital of external events and the credibility of their narrators. . . . Accordingly, [t]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review. . . .

"A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. *Strickland* v. *Washington,* [466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. This right arises under the sixth and

fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. . . . It is axiomatic that the right to counsel is the right to effective assistance of counsel. . . . A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . To satisfy the prejudice prong, [the petitioner] must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . The claim will succeed only if both prongs are satisfied. . . . Consequently, [i]t is well settled that [a] reviewing court can find against a petitioner on either ground, whichever is easier." (Internal quotation marks omitted.) *Raynor* v. *Commissioner of Correction*, 222 Conn. App. 584, 600–601, 306 A.3d 25 (2023), cert. denied, 348 Conn. 944, 307 A.3d 910 (2024).

"In order for a petitioner to prevail on a claim of ineffective assistance on the basis of deficient performance, he must show that, considering all of the circumstances, counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms. . . . In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice . . . are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions

regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. . . .

"[J]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable . . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; *that is, the* [*petitioner*] *must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.* . . . Indeed, our Supreme Court has recognized that [t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. . . . [A] reviewing court is required not simply to give [the trial attorney] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [he] did . . . ." (Emphasis in original; internal quotation marks omitted.) *Morales* v. *Commissioner of Correction*, 220 Conn. App. 285, 305–306, 298 A.3d 636, cert. denied, 348 Conn. 915, 303 A.3d 603 (2023).

"Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case,

viewed as of the time of counsel's conduct. . . . At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Internal quotation marks omitted.) *Jordan* v. *Commissioner of Correction*, 197 Conn. App. 822, 832, 234 A.3d 78 (2020), aff'd, 341 Conn. 279, 267 A.3d 120 (2021).

## I

We begin with the petitioner's claim that the habeas court improperly determined that Sturman was not ineffective in his cross-examination of two witnesses. Specifically, the petitioner asserts that Sturman's cross-examination of Carrillo, an eyewitness, and Curcuro, a detective who interviewed the petitioner, were deficient. We disagree.

The following legal principles pertaining to the deficient performance component of the *Strickland* test are relevant to our resolution of these claims. "As this court has explained, [o]nce an attorney makes an informed, strategic decision regarding how to cross-examine a witness, that decision is virtually unchallengeable." (Internal quotation marks omitted.) *Mercer* v. *Commissioner of Correction*, 222 Conn. App. 713, 746, 306 A.3d 1073 (2023), cert. denied, 348 Conn. 953, 309 A.3d 303 (2024). "[A]n attorney's line of questioning on examination of a witness clearly is tactical in nature. [As such, this] court will not, in hindsight, second-guess counsel's trial strategy. . . . The fact that counsel arguably could have inquired more deeply into certain areas, or failed to inquire at all into areas of claimed importance, falls short of establishing deficient performance." (Internal quotation marks omitted.) *Crenshaw* v. *Commissioner of Correction*, 215 Conn. App. 207, 228–29, 281 A.3d 546, cert. denied, 345 Conn. 966, 285 A.3d 389 (2022); see also *Ricardo R.* v. *Commissioner of*

*Correction*, 185 Conn. App. 787, 802, 198 A.3d 630 (2018) ("[a]lthough the petitioner, with the benefit of hindsight, may now prefer that trial counsel had undermined [the witness'] testimony . . . he fails to sufficiently demonstrate how the line of questioning [trial counsel] actually pursued was not part of a sound trial strategy, or how it fell outside the range of competence displayed by lawyers with ordinary training and skill in the criminal law"), cert. denied, 330 Conn. 959, 199 A.3d 560 (2019).

A

First, the petitioner argues that Sturman's cross-examination of Carrillo was deficient because he failed to (1) highlight discrepancies between Carrillo's statement to the police and her testimony at the criminal trial and (2) elicit testimony that would demonstrate the fallibility and unreliability of her eyewitness identification of the petitioner. We disagree.

The following additional procedural history is relevant to the petitioner's claim. During a suppression hearing, Carrillo was asked to make an identification of the shooter, and she identified the legal intern for the public defender's office who was sitting at counsel table. Subsequently, during the petitioner's criminal trial, she made an in-court identification of the petitioner as the shooter. On cross-examination, however, she acknowledged that she had misidentified the shooter during the suppression hearing. In addition, she conceded that she only saw the shooter's clothes on the night of the shooting. She agreed with Sturman that she switched to different windows as the incident unfolded, that the distance between her apartment windows and the spot on the pavement where the victim fell was a long distance, and that it was nighttime when she observed the shooting. Sturman emphasized these points during his closing argument. Sturman, however, did not question Carillo about discrepancies between

her criminal trial direct testimony and her statement to the police.[5]

At the petitioner's habeas trial, Baldwin recounted that she and Sturman "talked about Miss Carrillo a lot." Specific points they wanted to elicit in Carrillo's cross-examination included: her distance from the incident, the lack of lighting at the time of the incident, and the impact that running between windows would have had on her ability to observe. It was their plan to further emphasize that Carrillo identified the clothing worn by the shooter and did not identify the shooter.

The petitioner's counsel presented an eyewitness identification expert during the habeas trial.[6] The habeas court found that an expert would have testified that there was an increased risk of misidentification because: the identification was cross-racial in nature; there existed several opportunities for change blindness;[7] and the darkness and the distance of the apartment from the incident would have affected her memory of the shooter's characteristics. The habeas court, in addressing the two claims of deficiency in cross-examining Carrillo about the inconsistent statements and reliability of her identification, found that the petitioner's assertions were "flatly belied by the evidence presented at the criminal trial." The habeas court focused

[5] Inconsistencies between her statement to the police and her testimony at trial included whether she saw the following: a gun during the shooting, a man biking circles around the shooter, and the shooter pull something from his waistband with both hands. She also gave inconsistent statements regarding the order in which she looked out her windows in her apartment. Her statement to the police was not introduced as an exhibit at the criminal trial.

[6] According to Baldwin, Sturman looked into the possibility of obtaining an expert on eyewitness identification. However, Baldwin did not know the full reasons why an expert was not hired.

[7] The expert testified that "[c]hange blindness refers to a phenomenon where we miss subtle and sometimes large changes in the environment because of, basically, inattention, and it has been demonstrated to affect person recognition when there is a disruption in the continuity of the view."

on the fact that Sturman had extensively cross-examined Carrillo about her ability to view the incident from her apartment windows and her misidentification of an intern as the shooter during the suppression hearing.

We agree with the habeas court that Sturman's cross-examination of Carrillo did not fall below an objective standard of reasonableness considering all of the circumstances. Sturman was faced with challenging compelling testimony from the sole eyewitness, and his cross-examination was robust and made the jury aware of problems with the identification. He called attention to the fallibility of the eyewitness identification during the cross-examination by highlighting the cross-racial nature of the identification, the distance between Carrillo's apartment window and the scene, the difficulty Carrillo experienced when trying to pinpoint features of other individuals on the scene, and the misidentification that took place during the suppression hearing. This court will not, in hindsight, second-guess Sturman's trial strategy; the petitioner's argument that Sturman could have inquired further into certain areas during cross-examination falls short of establishing deficient performance.[8] *Crenshaw* v. *Commissioner of Correction*, supra, 215 Conn. App. 228–29. Accordingly, the habeas

---

[8] The habeas corpus petitioner faces a "significant hurdle" in "seeking to prove a claim of ineffective assistance of trial counsel [if] trial counsel . . . is unavailable to provide evidence of counsel's strategic decisions regarding, inter alia, the pursuit of defenses for her client and calling witnesses in support of those defenses." *Jordan* v. *Commissioner of Correction*, supra, 197 Conn. App. 823. "[I]t is not necessary for a reviewing court to resolve what strategic decisions defense counsel *actually* made, but it is required to presume that the challenged actions were within the wide range of reasonable professional conduct if, under the circumstances, it *might have been* sound trial strategy." (Emphasis in original; internal quotation marks omitted.) Id., 862. The petitioner "has the burden to overcome that presumption of reasonable professional conduct" and trial counsel's unavailability "[does] not relieve the petitioner of the substantial burden of demonstrating that [trial counsel's] representation was less than constitutionally competent." Id.; see id., 862 (death of trial counsel did not relieve petitioner's burden).

court properly determined that the petitioner failed to establish deficient performance.

B

The petitioner next asserts that Sturman rendered ineffective assistance by inadequately cross-examining Curcuro. The petitioner claims that Sturman's cross-examination should have given the jury a "reason to disbelieve the petitioner's inculpatory statements" by introducing details about Curcuro's interview of the petitioner. Specifically, he emphasizes that Sturman "did not question Curcuro on whether tactics such as: repeatedly insisting the petitioner was lying, insisting they had proof he was lying, suggesting there were probably extenuating circumstances that excused shooting the victim, and assuring him he would be better off if he confessed and showed remorse, were tactics that Curcuro had been trained to use to wear a suspect down." We are not persuaded.

The habeas court judge found that Sturman cross-examined Curcuro and elicited the following. On the night of the incident, Curcuro first interviewed the petitioner at 1 a.m. The petitioner denied involvement with or knowledge of the shooting, and the interview was terminated around 2 a.m. Another interview was initiated about three hours later, and the petitioner confirmed that he was present at the scene of the homicide after being shown still photographs of him taken from video surveillance footage from one of the apartment complex's cameras. The petitioner continued denying that he was the shooter. However, about thirty minutes into the second interview, he confessed to shooting the victim.

Curcuro also described the following about the interview process. He repeatedly told the petitioner he was there to help him. Furthermore, Curcuro knew that a confession from the petitioner would be helpful to the

police. The petitioner was dressed solely in an under-shirt, underwear, and a hospital gown because the police had taken his clothing.

In its memorandum of decision, the habeas court concluded that "Sturman examined the areas now com-plained of and [the petitioner] cannot prove that had Attorney Sturman better or further inquired into these areas, there is a reasonable likelihood that the outcome of the trial would have been different."

We agree with the habeas court that Sturman's perfor-mance did not fall below an objective standard of rea-sonableness and thus was not deficient. As found by the habeas court, Sturman elicited testimony about the circumstances surrounding the petitioner's interview. Through Sturman's cross-examination of Curcuro, the jury was put on notice about the uncomfortable circum-stances under which the petitioner was interviewed, the false insistence that he was helping the petitioner, and other facts that could reasonably demonstrate that Curcuro's interview tactics were coercive. We will not second-guess trial counsel's strategy; evidence of coun-sel's failure to inquire into certain areas of claimed importance in as much detail as the petitioner claims in hindsight was necessary falls short of establishing deficient performance. See *Crenshaw* v. *Commissioner of Correction*, supra, 215 Conn. App. 228–29; see also *Antonio A.* v. *Commissioner of Correction*, 148 Conn. App. 825, 832, 87 A.3d 600 (noting " 'attorney's line of questioning on examination of a witness clearly is tactical in nature' "), cert. denied, 312 Conn. 901, 91 A.3d 907 (2014).

Accordingly, the petitioner's claim that Sturman ren-dered ineffective assistance of counsel by inadequately cross-examining the two witnesses fails.

## II

Next, the petitioner claims that the habeas court improperly determined that Sturman was not ineffective in his failure to introduce cell phone records from the night of the shooting. The petitioner asserts that the habeas court's reliance on Baldwin's testimony is misplaced. The petitioner further argues that introducing the cell phone records and establishing that the petitioner was on his cell phone during the shooting was a critical element of the theory that he was not the shooter because his right and dominant hand was in a cast. We are not persuaded.

The following additional procedural history is relevant to our resolution of this claim. During the criminal trial, the petitioner testified that he was on the phone with his girlfriend at the time of the incident. He stated that he was holding his phone with his left hand.

By way of background, Fung Kwok, a state forensic expert, was called by the state to testify as to the gunshot residue (GSR) testing he performed on the petitioner and the victim. His report was admitted as evidence at the criminal trial. One of his analyses detected lead from residue on the petitioner's left palm, the back of his right hand, and the right cuff of his sweatshirt. He testified that presence of a GSR element, such as lead, can indicate that someone fired a gun, because the particles are typically expelled from the gun onto the shooter's hand or clothing. However, with time, the GSR particles can fall from or be brushed off of the hand or clothing. On the basis of the GSR results here, Kwok could not confirm if the petitioner, or the victim, had fired a gun.

At the habeas trial, Baldwin provided relevant testimony as to the petitioner's claim that the cell phone records should have been introduced at trial. She and Sturman had reviewed the cell phone records to confirm

whether the petitioner was on the phone at the time of the shooting. To her recollection, however, Sturman's primary focus was third-party culpability. She believed that drawing attention to the petitioner's hands "might not have been the best defense" because the state's theory, in reliance on the GSR evidence, was that the petitioner used his right hand to shoot the victim.

In its memorandum of decision, the habeas court stated that the cell phone records, and thus the fact that the petitioner was on the phone at the time of the incident, do not preclude the possibility that the petitioner shot the victim. As a result, the habeas court "[could not] conclude that counsel performed deficiently by failing to introduce the [cell] phone records or that there is a reasonable likelihood of a different outcome."

The following legal standards on the deficient performance prong are relevant to our resolution of this claim. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. . . . Indeed, our Supreme Court has recognized that [t]here are countless ways to provide effective assistance . . . ." (Internal quotation marks omitted.) *Morales* v. *Commissioner of Correction*, supra, 220 Conn. App. 305–306. This assessment applies when defense counsel decides not to raise certain issues or evidence during trial. See *Ramey* v. *Commissioner of Correction*, 150 Conn. App. 205, 214, 90 A.3d 344 (finding defense counsel's decision not to raise issue of petitioner's level of intoxication to jury, in order to avoid calling attention to petitioner's intoxication, " 'falls into the category of trial strategy or judgment calls that we consistently have declined to second guess' "), cert. denied, 314

Conn. 902, 99 A.3d 1168 (2014); *Peruccio* v. *Commissioner of Correction*, 107 Conn. App. 66, 84, 943 A.2d 1148 (holding defense counsel's decision to not introduce photographs of victim was matter of trial strategy), cert. denied, 287 Conn. 920, 951 A.2d 569 (2008).

We conclude that Sturman did not render deficient performance in deciding not to introduce the cell phone records because that decision reflected sound trial strategy. Baldwin explained to the best of her recollection that, in choosing not to focus on the phone call between the petitioner and his girlfriend, Sturman avoided calling attention to the petitioner's hands and thus avoided the state's further probing of the concerning GSR evidence. "Simply put, trial counsel made a reasonable strategic decision that the risk associated with presenting [certain] evidence . . . was not justified." *Clinton S.* v. *Commissioner of Correction*, 174 Conn. App. 821, 832, 167 A.3d 389, cert. denied, 327 Conn. 927, 171 A.3d 59 (2017); see *Watson* v. *Commissioner of Correction*, 111 Conn. App. 160, 171, 172, 958 A.2d 782 (counsel's decision to not introduce investigative report because it would "invite difficult questions" fell "within the category of strategic decisions that our courts consistently refuse to second-guess"), cert. denied, 290 Conn. 901, 962 A.2d 128 (2008). Accordingly, the habeas court did not improperly determine that the petitioner failed to establish that Sturman's decision not to introduce the cell phone records was unreasonable.

III

We finally turn to the petitioner's claim that the habeas court improperly determined that Sturman was not ineffective in failing to consult or present experts during the criminal trial. Specifically, the petitioner claims that the assistance of experts on false confessions and crime scene reconstruction was necessary to his defense. We address each claim in turn.

## A

First, the petitioner argues that the habeas court improperly concluded that he had failed to establish that he was prejudiced as a result of Sturman's allegedly deficient performance in failing to consult or present the testimony of an expert on false confessions.[9] We are not persuaded.

The following additional facts and procedural history are relevant to our discussion. At the criminal trial, Curcuro testified that his first task upon assignment to the investigation was to interview the petitioner, in an interview room, the night of the shooting. During the first interview, Curcuro asked the petitioner multiple times whether he was in the area of the shooting. The petitioner denied being there and, after one hour of questioning, terminated the interview at around 2 a.m.

Curcuro then swabbed the petitioner for GSR and DNA testing. Curcuro also was able to obtain screenshots of the apartment building's surveillance footage, which showed the petitioner to be present at the time of the incident. Curcuro then initiated a second interview with the petitioner around 5 a.m. and showed the petitioner still photographs of him taken from video surveillance footage. About ten minutes into the second interview, the petitioner admitted to his presence in the group at the time of the shooting. He continued to deny any involvement in the shooting. However, several minutes later, he explained to Curcuro that "I was just . . . going through the projects, and some guy said something to one of my peoples. I don't know. So we paid him no mind, crossed the bridge, went to [Crystal].

---

[9] Because we conclude that the habeas court properly determined that the petitioner failed to establish prejudice, we need not address *Strickland*'s performance prong. See *Davis* v. *Commissioner of Correction*, 198 Conn. App. 345, 367–68, 233 A.3d 1106, cert. denied, 335 Conn. 948, 238 A.3d 18 (2020).

Next thing you know, we're coming back, and he's just walking around. He's right there now. He pulls out a gun and starts shooting. We start shooting back. And then he just . . . then he just dropped. He opened fire first."[10]

As summarized by the habeas court, Curcuro acknowledged the following when cross-examined by Sturman. "[I]t would have been helpful to [the police if the petitioner] had confessed to the murder and, [that] during the course of the interrogation, [he] was suggesting a defense of extenuating circumstances to [the petitioner]. . . . [He] repeatedly told [the petitioner] that he was there to help [the petitioner]." During the interviews, the petitioner was wearing an undershirt, underwear, and a hospital gown because the police had taken the petitioner's clothing as evidence.

The petitioner testified at length during the criminal trial. He testified that he did not shoot the victim. He also described the interview conducted by Curcuro. The petitioner stated that he initially lied about being present during the shooting because he was scared, and he later refused to provide the names of the shooters because he was afraid of retaliation. He explained that he gave a false confession because he believed Curcuro would only settle for a confession from him and did not want to hear that someone else shot the victim. During the criminal trial closing arguments, Sturman addressed the petitioner's confession. "Sturman repeatedly noted [the petitioner's] numerous denials and provided reasons why he may have ultimately confessed. He argued that due to the weakness of the eyewitness identification, the police needed a confession and so went aggressively after [the petitioner] in their interrogations."

---

[10] It bears repeating the content of footnote 2 of this opinion.

At the habeas trial, Curcuro testified about his interviews of the petitioner. Baldwin also testified about her conversations with Sturman and decisions that were made to minimize damage caused by the petitioner's confession. The habeas court found that "Baldwin and Sturman questioned why [the petitioner] gave a statement and explored how that impacted their position that the perpetrator was someone else. . . . [Baldwin was] unaware if Attorney Sturman conducted any research on false confessions. They did not consider consulting with an expert, and [she] could not provide a reason why."

During the habeas trial, Brian Cutler testified as an expert on coerced compliance and forced confessions. When retained to consult on false confessions, "he typically evaluates the record including any recording of an interrogation, information about the suspect that indicates personal risk factors for false confessions and informs counsel about the relevant research and finally offer[s] opinions about the interrogation tactics used and analyzes the record for evidence of contamination of the confession."

Cutler provided his analysis of the petitioner's interview. He "noted that [the petitioner] was a young adult at the time of the interrogation, which occurred late at night or in the early morning. [The petitioner] mentioned that he was fatigued at various times; that he was cold and uncomfortable. [Cutler] also noted certain features present in [the petitioner's] interrogation that would fall under the categories of tactics that could lead to a false confession such as theme development or building toward an explanation of justification, offering to help the suspect, direct positive confrontation or false evidence ploys, suggesting that the interrogator knows that happened, expectation of reciprocity of honesty, and the notion that time is limited to come clean. He characterized it as a powerful interrogation in the

number and type of tactics used. Some tactics were problematic in that the investigators repeatedly said they were there to help and that confessing was in his best interest. This is the type of interrogation that could convince an innocent person that confessing was the best option for damage control. He did not see any evidence of mental illness or disability but opined that [the petitioner] was young at the time and that combined with any fatigue or discomfort would affect his ability to self-regulate." However, Cutler acknowledged that he had no way of knowing whether a particular confession was true.

In its memorandum of decision, the habeas court stated the following: "Assuming that Attorney Sturman did not consult such an expert and a false confession expert would have been permitted to testify, [the petitioner] must still prove that the failure to do so prejudiced him. This he has not done." The court determined that the evidence presented did not "demonstrate that [the petitioner's] confession was, in fact, false and would either have been suppressed or the expert's testimony so compelling when applied to the facts of this case that the jury would have completely disregarded his statement that he—or we—shot the victim." Furthermore, the court recognized the influence that Carrillo's testimony had on the jury, as she identified the petitioner as the shooter.

On appeal, the petitioner asserts that this is a "textbook example" of a coerced confession where the only reasonable and available defense strategy involves a consultation with and/or presentation of an expert. The petitioner argues that consulting an expert would have (1) made Sturman aware of the issues he needed to focus on relating to false confessions and (2) given the jury a basis to believe that the petitioner, as a result of Curcuro's interviewing methods, could have falsely confessed. The petitioner contends that Sturman did

little to elicit testimony from Curcuro or to present other evidence that would have persuaded a jury that the petitioner made a false confession.

The following legal principles are applicable. "An evaluation of the prejudice prong involves a consideration of whether there is a reasonable probability that, absent the errors, the [fact finder] would have had a reasonable doubt respecting guilt. . . . A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . We do not conduct this inquiry in a vacuum, rather, we must consider the totality of the evidence before the judge or jury. . . . Further, we are required to undertake an objective review of the nature and strength of the state's case. . . . As our Supreme Court [has explained], [s]ome errors will have had pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. . . . [A] court making the prejudice inquiry must ask if the [petitioner] has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . .

"In other words, [i]n assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . Instead, *Strickland* asks whether it is reasonably likely the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable. . . . Notably, the petitioner must meet this burden not by use of speculation but by demonstrable realities." (Internal quotation marks

omitted.) *Hilton* v. *Commissioner of Correction*, 225 Conn. App. 309, 327–28, 315 A.3d 1135 (2024).

We agree with the habeas court and conclude that Sturman's performance did not prejudice the petitioner. At best, an expert could have provided insight to Sturman and/or the jury regarding false confessions. Yet, Sturman's cross-examination of Curcuro and his closing argument to the jury reflected that he was aware of the issues with the confession and conveyed them to the jury. Furthermore, expert testimony would not change the fact that the jury had for its consideration other evidence, including Carrillo's on scene identification and the GSR evidence. As a result, the petitioner has failed to demonstrate that there exists a reasonable probability that, but for Sturman's failure to consult or present an expert on coerced and false confessions, the outcome of the proceeding would have been different. See *Jones* v. *Commissioner of Correction*, 212 Conn. App. 117, 128–36, 274 A.3d 237, cert. denied, 343 Conn. 933, 276 A.3d 975 (2022).

B

Second, the petitioner argues that Sturman was deficient for failing to present an expert on crime scene reconstruction. We disagree.

The following additional procedural history is relevant to the resolution of this claim. In preparation for the criminal trial, Sturman hired an investigator to take photographs but ultimately determined that those images would not be helpful to the jury. He also submitted a motion to have the jury view the scene of the crime, allowing the jury to see the distance from which Carrillo witnessed the shooting, but that motion was denied.

During the criminal trial, a state trooper testified that the scene of the shooting was 265.49 feet from Carrillo's

window. The jury also saw photographs and videos of the crime scene. Sturman, through the cross-examination of another state trooper, elicited that an extensive number of lights were deployed to illuminate the crime scene while the photographs and videos were captured. During closing argument, Sturman focused on the unreliability of Carrillo's testimony, pointing out that the identification emphatically was made at night from the fifth floor of the apartment building at about 265 feet from the scene.

During the habeas trial, the petitioner's counsel questioned Baldwin. Although Baldwin was not aware of whether Sturman consulted with a crime scene expert, she testified that both she and Sturman discussed Carrillo's inability to see the incident due to distance and darkness. In addition, a crime scene reconstruction expert, Peter Valentin, testified on behalf of the petitioner. Valentin took "photographs from Carrillo's apartment to replicate what she would have been able to observe . . . he used the options on the camera to make the photographs mimic what could be seen with the naked eye. The photograph that best matched the naked eye view was admitted as an exhibit."

In its memorandum of decision, the habeas court found that Sturman was not deficient for failing to hire a crime scene reconstruction expert. "The evidence establishes that he attempted to take photographs; the jury was presented with several photographs of the scene; the distance from the apartment to the scene was known to the jury and he made a motion for jury view which was denied. Clearly, the ability of Carrillo to see the incident from her apartment was challenged by the defense."

On appeal, the petitioner contends that a proper recreation provided by an expert, such as the one created

by Valentin, would have provided the jury with an accurate view of how far Carillo was from the scene and how the low lighting would have made it difficult to see people and their clothing. In turn, the petitioner asserts that "[a]ny reasonably competent attorney would have hired an expert to capture that vantage point rather than rely on his own investigator, not equipped as an expert, to recreate the scene."

The following legal principles are relevant to our resolution of this claim. "[T]here is no per se rule that requires a trial attorney to seek out an expert witness. However, this court noted that in some cases, the failure to use any expert can result in a determination that a criminal defendant was denied the effective assistance of counsel." (Internal quotation marks omitted.) *Kellman* v. *Commissioner of Correction*, 178 Conn. App. 63, 77, 174 A.3d 206 (2017). "[F]ailing to retain or utilize an expert witness is not deficient when part of a legitimate and reasonable defense strategy. . . . Our appellate courts repeatedly have rejected a petitioner's claim that his trial counsel rendered deficient performance by failing to call an expert witness at trial on the ground that trial counsel's decision was supported by a legitimate strategic reason." (Internal quotation marks omitted.) *Vega* v. *Commissioner of Correction*, 224 Conn. App. 652, 665, 312 A.3d 1142, cert. granted, 349 Conn. 914, 315 A.3d 300 (2024).

We agree with the habeas court that Sturman did not render deficient performance by failing to consult with or hire a crime scene reconstruction expert. At the habeas trial, the crime scene reconstructionist presented a photograph mimicking the conditions under which Carrillo was seeing the shooting—and this would have been his primary, if not sole, contribution to the criminal trial. Although the accuracy of the crime scene reconstructionist's photograph surpassed that of the photographs presented to the jury during the criminal

trial, the jury had ample evidence at its disposal to evaluate Carrillo's ability to see the incident from her apartment. Thus, the petitioner has not shown that Sturman performed deficiently by not consulting with or hiring a crime scene reconstruction expert. Accordingly, the petitioner's claim cannot prevail under *Strickland*.

The judgment is affirmed.

In this opinion the other judges concurred.