******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# TERRELL CANADY *v.* COMMISSIONER OF CORRECTION
## (AC 46729)

Suarez, Westbrook and Lavine, Js.

*Syllabus*

The petitioner, who had been convicted of, inter alia, felony murder, appealed after the habeas court denied his petition for certification to appeal from its judgment denying in part his habeas corpus petition. The petitioner claimed, inter alia, that the court had improperly denied his ineffective assistance of counsel claim, in which he contended that his criminal trial counsel, C, failed to have the petitioner's mother, T, removed as his guardian ad litem because she was interfering with plea discussions. *Held*:

The habeas court did not abuse its discretion in denying the petition for certification to appeal to this court, as the petitioner failed to demonstrate that his claims related to C's actions involving T as his guardian ad litem involved issues that were debatable among jurists of reason, were adequate to deserve encouragement to proceed further or could be resolved by a court in a different manner.

The habeas court properly determined that the petitioner was not deprived of the effective assistance of his trial counsel stemming from C's failure to have T removed as the petitioner's guardian ad litem, as C did not perform deficiently but, instead, reasonably made a strategic decision not to seek the complete removal of T, taking into account the close relationship between the petitioner and T and that T's removal would have been counterproductive and could have further impeded C's discussions with the petitioner, and the failure to remove T did not prejudice the petitioner, there having been no reasonable probability that her removal would have resulted in a different outcome at trial.

The petitioner's due process claim that the trial court failed to ensure that T was acting in his best interests as his guardian ad litem was procedurally defaulted, as that claim was not raised at the petitioner's criminal trial or on direct appeal from his conviction, the petitioner did not establish that the failure to do so was the result of ineffective assistance by his appellate counsel, the petitioner neither called appellate counsel to testify at the habeas trial nor presented other evidence regarding counsel's reason for not raising the due process claim, and this court declined to review the petitioner's unpreserved claim that the novel nature of his due process claim constituted cause to excuse his procedural default.

Argued October 23, 2024—officially released March 25, 2025

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Bhatt, J.*; judgment denying the petition in part; thereafter, the court denied the petition for certification to appeal, and the petitioner appealed to this court. *Appeal dismissed.*

*Robert L. O'Brien*, assigned counsel, with whom, on the brief, was *Christopher Y. Duby*, assigned counsel, for the appellant (petitioner).

*Brett R. Aiello*, assistant state's attorney, with whom, on the brief, were *Margaret E. Kelley*, state's attorney, and *Angela R. Macchiarulo*, supervisory assistant state's attorney, for the appellee (respondent).

*Opinion*

LAVINE, J. The petitioner, Terrell Canady, appeals, following the denial of his petition for certification to appeal, from the judgment of the habeas court denying in part his amended petition for a writ of habeas corpus. On appeal, the petitioner claims that the court improperly (1) denied his petition for certification to appeal, (2) rejected his claim that he was deprived of the effective assistance of trial counsel, and (3) concluded that his due process claim was procedurally defaulted. We disagree that the court improperly denied the petition for certification and, accordingly, dismiss the appeal.

The following facts underlying the petitioner's criminal conviction, which the jury reasonably could have found, were set forth by our Supreme Court in *State* v. *Canady*, 297 Conn. 322, 998 A.2d 1135 (2010), its decision rejecting the petitioner's direct appeal. "During the late evening hours of October 17, 2004, the [fifteen year old petitioner], a New Haven resident, and his fourteen year old friend, Nadrian Campbell, a resident of West Haven, were walking through West Haven when they

encountered the victim, Robin Swick. The [petitioner] asked the victim if she wanted to have sex with him, and the victim agreed to do so as long as the [petitioner] paid her. The victim, Campbell and the [petitioner] then went behind a store where the victim engaged in sexual acts with the [petitioner] and Campbell.

"Thereafter, the three continued to walk around West Haven. After a period of time, the [petitioner] decided that he wanted to have sex with the victim again, and he borrowed $50 from Campbell to do so. At this point, the victim and the [petitioner], who, along with Campbell, were standing in front of a furniture store, went behind one of the store's delivery trucks and engaged in sexual intercourse. When Campbell next saw the [petitioner] and the victim, the [petitioner] was holding the victim's clothes, and the victim, who was standing next to the [petitioner], was wearing only a pair of socks. The victim's cell phone fell from her clothes, and, as she went to pick it up, the [petitioner], who was wearing boots, kicked her in the mouth. Campbell walked away and did not see the [petitioner] strike the victim again. After Campbell left, however, the [petitioner] repeatedly assaulted the victim, leaving her severely wounded. Ten minutes later, the [petitioner], carrying the victim's clothes and cell phone, approached Campbell a few blocks away. The [petitioner] returned Campbell's money, informing Campbell that he had robbed the victim. Shortly thereafter, the [petitioner] threw the victim's clothes into a nearby alleyway.

"The [petitioner] and Campbell eventually walked to the home of Kendra Bryant, arriving there at approximately 3 a.m. on October 18, 2004. Bryant opened a window and let Campbell climb inside, where he joined Bryant and her friend, Ebony Howell, who was spending the night at Bryant's residence. The [petitioner] remained outside but told the group of persons inside, who were within hearing distance, that 'he . . . beat up some

lady and took her cigarettes and stuff.' Campbell also told Bryant and Howell that the [petitioner] had struck the victim and stole her cell phone and cigarettes. After approximately one hour, Campbell and the [petitioner] left.

"Later that morning, the [petitioner] went to the home of Roscoe Morrison. The [petitioner] told Morrison that, while the [petitioner] was out the previous evening, he had 'beat[en] [a] lady' and stolen her money and cell phone. The [petitioner] then asked Morrison's half sister, Shanette Hargrove, to charge the victim's cell phone and to lend him a t-shirt. The [petitioner] told Hargrove, 'I think I killed somebody.' Hargrove initially thought that the [petitioner] was joking, but the [petitioner] elaborated: 'I kicked her in the face, but I don't know if she's dead.' . . .

"[A]n employee of the furniture store behind which the [petitioner] left the victim . . . discovered the victim's body lying between two of the store's delivery trucks at approximately 8 a.m. that same morning and called 911. The victim, who was wearing only a pair of socks, was pronounced dead shortly after the police arrived. An autopsy revealed that the victim had eight broken ribs and between forty and fifty abrasions on her body, including her face."[1] Id., 325–27.

The petitioner subsequently was arrested and charged with, inter alia, felony murder in violation of General Statutes § 53a-54c, manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1), and robbery in the first degree in violation of General Statutes § 53a-134 (a) (1).[2] Id., 324. Thereafter, the case

---

[1] A more detailed recitation of the facts is set forth in our Supreme Court's decision. See *State* v. *Canady*, supra, 297 Conn. 327–28.

[2] "The [petitioner] also was charged with second degree kidnapping and a second count of felony murder. At the conclusion of the state's case, however, the trial court granted the [petitioner's] motion for a judgment of acquittal as to those two charges." *State* v. *Canady*, supra, 297 Conn. 328 n.6.

automatically was transferred from the juvenile court docket to the regular criminal docket in accordance with General Statutes (Rev. to 2003) § 46b-127.[3] Id., 328. Following a jury trial, the jury found the petitioner guilty of felony murder, first degree manslaughter and first degree robbery.[4] Id. The trial court rendered judgment in accordance with the verdict and sentenced the petitioner to a total effective sentence of seventy-five years of incarceration. Id., 324. Our Supreme Court affirmed that judgment of conviction on direct appeal. See id., 345.

On May 2, 2013, the petitioner filed a petition for a writ of habeas corpus. The petitioner, through counsel, filed an amended petition, the operative petition, on July 23, 2018. In count one, the petitioner alleged that his criminal trial counsel, Vito A. Castignoli, had rendered ineffective assistance by failing to have the petitioner's mother, Tanya Canady (Tanya), removed as the petitioner's guardian ad litem during his criminal proceedings. The petitioner claimed that, but for Castignoli's deficient performance in failing to remove Tanya as his guardian ad litem, he would have accepted a plea offer extended by the state. In count two, the petitioner alleged that the court had violated his right to due process under the federal and state constitutions because it failed to conduct a hearing to determine whether Tanya was an appropriate guardian ad litem and to ensure that he had a guardian ad litem who could effectively represent his best interests.[5]

---

[3] General Statutes (Rev. to 2003) § 46b-127 provides in relevant part: "(a) The court shall automatically transfer from the docket for juvenile matters to the regular criminal docket of the Superior Court the case of any child charged with the commission of a capital felony, a class A or B felony or a violation of section 53a-54d, provided such offense was committed after such child attained the age of fourteen years . . . ."

[4] The manslaughter conviction was subsequently vacated. See footnote 7 of this opinion.

[5] The petition contained two additional counts. In count three, the petitioner raised a separate due process claim alleging that the sentencing court had incorrectly merged the convictions of manslaughter and felony murder

The respondent, the Commissioner of Correction, filed a return in which he either denied the substantive allegations of the petition or left the petitioner to his proof. With respect to the due process claim in count two, however, the respondent also raised an affirmative defense of procedural default on the basis of the petitioner's failure to raise his claim at trial or on direct appeal. In his reply to the respondent's return, the petitioner argued, inter alia, that the defense of procedural default did not apply to his due process claim, and, in the alternative, that he could establish cause and prejudice to overcome the procedural default on the basis of the ineffective assistance of his trial counsel.

The court, *Bhatt, J.*, held a trial on the habeas petition on May 10, 2023, at which four witnesses testified: the petitioner; Willie Melton, Jr., the petitioner's father; Stephanie Daniels, the petitioner's great aunt; and Castignoli.[6] In addition, a copy of the court clerk's file from the underlying criminal case and the transcripts from the petitioner's criminal proceedings were admitted into evidence as exhibits.

On May 30, 2023, the court issued a memorandum of decision denying the petition for a writ of habeas corpus. With respect to the ineffective assistance of counsel claim, the habeas court concluded that the petitioner had failed to establish both deficient performance and prejudice. Specifically, the court determined that, although the petitioner claimed that Castignoli should have sought to remove Tanya as guardian ad litem, the evidence established that he *did* seek to replace Tanya

---

because, under *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013), the court should have vacated the manslaughter conviction. In count four, the petitioner raised a separate claim of ineffective assistance of counsel based on his trial counsel's failure to preserve his right to sentence review. Those claims are not at issue in this appeal. See footnote 7 of this opinion.

[6] Tanya was not a witness at the habeas trial. The petitioner testified that she died in November, 2018.

as the guardian ad litem pursuant to a motion dated September 22, 2006. During a hearing on that motion, Castignoli specifically asked for removal of Tanya as the guardian ad litem as one option, and, as a second option, that another guardian ad litem be appointed. The court ultimately decided to appoint a second guardian ad litem, and Castignoli made a strategic decision at that point not to seek complete removal of Tanya as the guardian ad litem because he did not want to create further conflict in his relationship with the petitioner, and, given the closeness of the relationship between the petitioner and Tanya, he was certain that they would speak about the case anyway. As to prejudice, the habeas court concluded that the petitioner did not establish a reasonable probability that, but for Castignoli's allegedly deficient performance, he would have accepted a plea offer. The court pointed to the petitioner's own remarks at the motion hearing that he believed that his attorneys were pressuring him into accepting a plea offer and that he, *independently*, had decided not to accept any offer and that Tanya did not force him to do so. In addition, the court again emphasized the petitioner's close relationship with Tanya, concluding that it "[did] not believe that simply removing Tanya as the [guardian ad litem] . . . would have resulted in a different outcome" given that she still had access to and influence over the petitioner.

With respect to the petitioner's due process claim, the habeas court concluded that the claim was procedurally defaulted and, in any event, meritless because the criminal court had in fact conducted a hearing on the suitability of Tanya as the petitioner's guardian ad litem. After that hearing, the court determined that a guardian ad litem was appropriate and took steps to secure and protect the petitioner's rights by appointing a second guardian ad litem to assist the petitioner. Accordingly, the habeas court denied the habeas petition as to those

claims.[7] Thereafter, the petitioner filed a petition for certification to appeal, which the habeas court denied. This appeal followed. Additional facts and procedural history will be set forth as necessary.

Before we turn to the petitioner's claims, we briefly set forth our standard of review for habeas corpus appeals. "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Accordingly, [t]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Internal quotation marks omitted.) *Collins* v. *Commissioner of Correction*, 202 Conn. App. 789, 793, 246 A.3d 1047, cert. denied, 336 Conn. 931, 248 A.3d 1 (2021).

I

The petitioner first claims that the habeas court abused its discretion by denying his petition for certification to appeal. We conclude that the habeas court's ruling did not constitute an abuse of its discretion.

"Faced with the habeas court's denial of certification to appeal, a petitioner's first burden is to demonstrate that the habeas court's ruling constituted an abuse of discretion. . . . A petitioner may establish an abuse of discretion by demonstrating that the issues are debatable among jurists of reason . . . [a] court could resolve the issues [in a different manner] . . . or . . . the questions are adequate to deserve encouragement

---

[7] The court granted the habeas petition with respect to the petitioner's other two claims; see footnote 5 of this opinion; and, accordingly, vacated the petitioner's manslaughter conviction and restored his right to sentence review. The respondent has not challenged the habeas court's ruling on those counts, and those claims are not at issue in this appeal.

to proceed further. . . . The required determination may be made on the basis of the record before the habeas court and applicable legal principles. . . . If the petitioner succeeds in surmounting that hurdle, the petitioner must then demonstrate that the judgment of the habeas court should be reversed on its merits. . . .

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying [claim] to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive [claim] for the purpose of ascertaining whether [that claim satisfies] one or more of the three criteria . . . adopted by [our Supreme Court] for determining the propriety of the habeas court's denial of the petition for certification." (Internal quotation marks omitted.) *Hilton* v. *Commissioner of Correction*, 225 Conn. App. 309, 332–33, 315 A.3d 1135 (2024).

For the reasons set forth in parts II and III of this opinion, we conclude, on the basis of our review of the record and applicable legal principles, that the petitioner has failed to demonstrate that his underlying claims of error are debatable among jurists of reason, that a court could resolve the issues in a different manner, or that the questions are adequate to deserve encouragement to proceed further. See, e.g., *Glen S.* v. *Commissioner of Correction*, 223 Conn. App. 152, 159, 307 A.3d 951, cert. denied, 348 Conn. 951, 308 A.3d 1038 (2024).

II

Turning to his substantive claims on appeal, the petitioner asserts that the court improperly denied his ineffective assistance of counsel claim stemming from Castignoli's failure to have Tanya removed as the petitioner's

guardian ad litem. Specifically, the petitioner contends that Castignoli should have sought to fully remove Tanya as the petitioner's guardian ad litem because she was interfering with plea discussions. The petitioner further contends that, but for Castignoli's allegedly deficient performance, he would have accepted a plea offer. We are not persuaded on the basis of our review of the record and applicable legal principles that the petitioner has demonstrated that his claim is debatable among jurists of reason, that a court could resolve the issues in a different manner, or that the claim raises a question that deserves encouragement to proceed further.

At the outset, we set forth the following additional relevant legal principles governing ineffective assistance of counsel claims. "[I]t is well established that [a] criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. . . . This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. . . . It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . .

"To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Citation omitted; internal quotation

marks omitted.) *Crenshaw* v. *Commissioner of Correction*, 215 Conn. App. 207, 217, 281 A.3d 546, cert. denied, 345 Conn. 966, 285 A.3d 389 (2022).

"It is well settled that the two part *Strickland* test applies to challenges of ineffective assistance of counsel claims involving plea negotiations." *Watts* v. *Commissioner of Correction*, 194 Conn. App. 558, 565, 221 A.3d 829 (2019), cert. denied, 334 Conn. 919, 222 A.3d 514 (2020). "Counsel performs effectively and reasonably when he provides a client with adequate information and advice on which the client can make an informed decision as to whether to accept the state's plea offer." *Maia* v. *Commissioner of Correction*, 347 Conn. 449, 462, 298 A.3d 588 (2023). "[C]ounsel must not only explain to the defendant the strengths and weaknesses of the state's case, the charges he is facing, and the maximum sentence he would be exposed to if he were unsuccessful at trial, he also must advise his client on how those strengths and weaknesses relate to the state's likelihood of prevailing at trial and on the challenges a defendant would face in putting on his own defense. . . . Instead of failing to meet a prescribed, mechanical standard, counsel's performance has been held to be constitutionally deficient when counsel failed to provide his client with sufficient information about the client's sentencing exposure to allow the client to make a reasonably informed decision [regarding] whether to accept a plea offer. . . . Although trial counsel must leave the ultimate decision of whether to accept or to reject a plea offer to a defendant—and must avoid coercing the defendant into taking a particular plea—he must also provide the petitioner with adequate professional advice on his options." (Citations omitted; internal quotation marks omitted.) Id., 471.

"To demonstrate prejudice under the *Strickland* test when the deficient performance of counsel occurred in

the plea process and resulted in a defendant not enter-
ing into a plea agreement, the habeas petitioner must
show that but for the [deficient performance] of counsel
there is a reasonable probability that the plea offer
would have been presented to the court (i.e., that the
defendant would have accepted the plea and the prose-
cution would not have withdrawn it in light of interven-
ing circumstances), that the court would have accepted
its terms, and that the conviction or sentence, or both,
under the offer's terms would have been less severe
than under the judgment and sentence that in fact were
imposed. . . .

"Furthermore . . . the specific underlying question
of whether there was a reasonable probability that a
habeas petitioner would have accepted a plea offer but
for the deficient performance of counsel is one of fact,
which will not be disturbed on appeal unless clearly
erroneous. . . . A finding of fact is clearly erroneous
when there is no evidence in the record to support it
. . . or when although there is evidence to support it,
the reviewing court on the entire evidence is left with
the definite and firm conviction that a mistake has been
committed." (Citations omitted; internal quotation
marks omitted.) *Johnson* v. *Commissioner of Correc-
tion*, 228 Conn. App. 701, 712–13, 324 A.3d 837, cert.
denied, 350 Conn. 929, 326 A.3d 250 (2024).

The following additional procedural history is rele-
vant to our resolution of this claim. The petitioner was
fifteen years old at the time of these brutal offenses
and at the time that the underlying criminal proceedings
were initiated against him. At the petitioner's second
court appearance, on November 22, 2004,[8] the court
appointed Castignoli as the petitioner's counsel. Castig-
noli was assisted by Attorney Richard Marquette. The

---

[8] At the time of the petitioner's arraignment two weeks earlier, a public
defender had represented the petitioner, and the court temporarily appointed
a family relations officer as the petitioner's guardian ad litem.

court also appointed Tanya as the petitioner's guardian ad litem pursuant to Practice Book § 44-20.[9]

Prior to trial, the state extended a plea offer to the petitioner. Castignoli testified at the habeas trial that the offer would have resulted in a sentence of between twenty-five and thirty years of imprisonment. Castignoli testified that he conveyed this offer to the petitioner and Tanya, but Tanya did not want her son to accept an offer with a sentence of more than ten years. The state withdrew its offer in December, 2005, and the petitioner proceeded to trial.

On September 22, 2006, while jury selection was in progress, the petitioner's counsel filed a "motion to appoint additional and/or substitute guardian ad litem." In that motion, the petitioner's counsel claimed that it was "in the best interests of the ward to appoint a different or additional guardian ad litem for the [petitioner] because [Tanya] has made communication about evidence, trial strategy and other important matters between [the petitioner] and his counsel difficult if not impossible. Counsel does not believe it is in the best interests of [the petitioner] to continue [with] the present guardian ad litem although there is no doubt as to [Tanya's] love and affection for [the petitioner]. . . . Counsel believe that another guardian ad litem should be appointed to ensure that [the petitioner's] rights to a fair trial and adequate representation under the United States and Connecticut constitution[s] are complied with."

On that same date, before jury selection continued, Castignoli addressed the court regarding the motion and the concerns he had about Tanya serving as the

---

[9] Practice Book § 44-20 provides in relevant part: "The judicial authority may . . . appoint a guardian ad litem for a minor involved in any other criminal proceedings, including . . . those in which the minor is the defendant. . . ."

petitioner's guardian ad litem. Castignoli stated, among other things, that he believed the appointment of a guardian ad litem was wise in this case, but that his relationship with Tanya "has broken down at this point," and, "[w]ithout getting too deeply into it, I think . . . our relationship is at a point now where I don't think . . . he's going to get adequate representation if she continues as the guardian."[10] He asked the court to "either appoint a substitute guardian or an additional guardian."

The court proceeded with jury selection, then continued the hearing to address the motion filed by the petitioner's counsel. The court inquired of Castignoli, Marquette, Tanya, and the petitioner regarding their communications and the nature of their disagreements.[11] Castignoli explained that he and Tanya "had . . . the normal disagreements up until very, very recently," and, "at this point . . . that's not a good situation." Castignoli further stated: "I think [the petitioner] should have a guardian . . . but . . . I find the present situation unacceptable, and I've explained that to her. . . . [O]ne of the issues is seeing [the petitioner] alone. I don't see that the law says that we cannot see him alone. There are decisions that, obviously, would have to be made with the guardian, but, as I've explained to her, the decisions . . . that are her province solely and his . . . are very few. Most of the decisions to be

[10] Castignoli further explained: "What's happened recently in the matter is that . . . we don't get along very well, and I feel my interactions with the [petitioner] . . . have been affected by that, and we haven't been able to discuss things that people who are on trial or are going to go on trial should be able to discuss. And it's because of the guardian. . . . [A]t this point, her and I don't get along. . . . [O]ur communication with [the petitioner] has been impeded on things that we would have to discuss to [e]nsure he gets a fair trial and that . . . his constitutional rights are vindicated here."

[11] The court also asked the prosecutor about his observations of the interactions between the petitioner's counsel and Tanya. The prosecutor recalled witnessing an interaction between Marquette and Tanya during which Tanya told Marquette to "shut the 'f' up" and "to mind his own business . . . ."

made as to trial strategy are to be made by his attorneys. I just think, at this point, our relationship has broken down, not with [the petitioner], but with his mother, to the point where I think it's going to affect his defense at this trial." Castignoli added that "we've attempted to discuss things with him, and she's . . . made them impossible to discuss by mean[s] of arguments, things of that nature." Marquette indicated that he "[stood] united" with Castignoli on this issue.

Tanya stated that, in her view, Castignoli did not listen to her and the petitioner, and that Castignoli "makes decisions on his own." The petitioner told the court that Castignoli would "get loud" when they would try to ask him something.[12] The petitioner added, among other things, that "he been talking to me without my mother present. So, I don't know where he's talking about he can't speak to me without her there. . . . I don't know what's the problem of making any decision. . . . I chose to go to trial myself. I chose to plead not guilty. My mother did not force me to do it. I chose that decision."

At the conclusion of the hearing, the court issued an oral ruling on the motion in which it indicated that it would appoint a family relations officer as a second guardian ad litem for the petitioner. The court explained: "All right, well the situation, to point out the obvious, is that we have to have an effective guardian for [the petitioner], at least for the next several months. I think it is . . . in the motion itself [that the petitioner] will reach the age of majority on February 28, 2007. But we expect to go to trial and be on trial in October and November so that, while there is some discretion

---

[12] Marquette subsequently told the court that his "observations [have] always been that there's a conversation, and [Tanya] is the first one to get agitated. And then, when [Castignoli] raises his voice, it becomes even more excited by her part. . . . It's not [Castignoli] that first starts to yell. It doesn't happen."

involved, I think the better part of discretion should be that [the petitioner] should have a guardian to advise him. . . .

"[T]his offense allegedly occurred when he was fifteen years old. He's been incarcerated now for almost two years, and I think he really needs an effective guardian in this case. Again, to point out the obvious, there's nothing more important than the charges here . . . . The consequences are potentially extreme in terms of the remainder of [the petitioner's] young life so that I think he should have guidance from a responsible adult."

Speaking to the petitioner, the court stated: "[Y]ou do have the services of two fine attorneys. Mr. Castignoli has done countless serious felony trials that I'm aware of, including a number in front of me, always quite effectively and so that having had this background with him, which goes back about two decades, when he files a motion such as this and says he's in this predicament . . . the court takes it very seriously.

"Now, under Practice Book § 44-20 the court does have the prerogative to appoint someone else as guardian, and I'm mindful of a recent case in this area, [*State* v. *Iban C.*, 275 Conn. 624, 881 A.2d 1005 (2005)]. . . . I'm aware of the dictates of that case as well and, I think, given the gravity of this situation and the important, very important and critical decisions which are forthcoming, that . . . the court must be assured that you are getting proper guidance from someone who has your legal interests in mind.

"Again, to reiterate, no one questions your mother's love and affection for you, but that's not what's important here. What is important at this point is that you're getting guidance in terms of these very important decisions, which you need to make along with your attorneys, during the course of the next several weeks.

"In that regard, given the situation with which we find ourselves presented, I'm going to appoint another guardian, a family relations officer, as a second, as requested by your attorneys, as a second guardian ad litem to be with you during these proceedings and to advise you and . . . act as your guardian again during the court proceedings. And, hopefully, with someone else there, another person to advise you, that will alleviate the situation that your attorneys find themselves in now. . . ."

After the court made its ruling, the following colloquy occurred:

"[The Petitioner]: You keep saying you want me to have proper advice. Well, Mr. Castignoli keep trying to advise me to plead out, and I keep telling him no. He keep pressuring me, and . . . my mother is right here, keep telling me the same thing. He keep coming toward me and pressuring me to cop out, and I say no and I don't want Mr. Castignoli to represent me anymore 'cause he keep pressuring me.

"[Marquette]: Your Honor, we dispute that characterization. . . . [W]e feel it's an obligation of ours to discuss plea options, but . . . we never sort of forced it, as he's intimating. It's not our style. . . . [W]e discuss all options."

"The Court: Obviously, you haven't been forced to do anything, Mr. Canady. You've been through other attorneys as well; as I said, you have two attorneys representing you now who are doing an excellent job. The trial is going forward. . . . So, the attorneys will continue on, and there'll be a new guardian ad litem appointed to represent you and to advise you."

The case proceeded to trial in October and November, 2006, with Karen Kutno, a family relations officer, serving as the petitioner's second guardian ad litem.

Castignoli testified at the habeas trial that he had drafted a letter for the petitioner to sign in which he stated his opinion that the state's evidence was strong and advised making an offer to the state that included a twenty year sentence in exchange for a guilty plea to the manslaughter charge.[13] Tanya did not want Castignoli to give the petitioner that advice, and she crumpled up the letter and threw it on the ground. The petitioner recalled this incident as well. Castignoli testified that, even though the petitioner did not receive the letter, he had reviewed with the petitioner the information contained in the letter regarding the evidence against him.

During preparations for closing argument, Tanya approached Castignoli and suggested a plea in exchange for a sentence of fifteen years. Marquette spoke to the prosecutor. The state then made an offer involving a sentence with a cap of thirty-two years and a base of twenty-eight years of incarceration. Castignoli conveyed that offer to the petitioner and Tanya, and the offer was rejected. As set forth previously in this opinion, the petitioner subsequently was convicted of felony murder, manslaughter in the first degree, and robbery in the first degree, and he was sentenced to seventy-five years of incarceration.

At the habeas trial, the petitioner and Castignoli both testified that Tanya was present at nearly all of their meetings. The petitioner described the meetings as "tense" and testified that Tanya would try to control the conversation. They both recalled discussing the state's evidence during their meetings and, from these discussions, the petitioner understood the nature of the state's

---

[13] Although the precise timing of this incident is not clear from the record, the petitioner recalled that it occurred when trial was taking place, which is consistent with Castignoli's recollection that the second guardian ad litem was present at that time.

case against him. Castignoli believed the state's evidence against the petitioner was strong, and he conveyed that to the petitioner and Tanya. Castignoli believed that the point of contention between him and Tanya was the strength of the state's evidence, as she did not believe the state's case was strong. She also believed that he was trying to "railroad" the petitioner into "do[ing] something" for the state.

With respect to pretrial plea negotiations, the petitioner and Castignoli both testified that Tanya did not want the petitioner to consider an offer that would result in a sentence of more than ten years of incarceration. Unfortunately, her love for her son distorted her ability to make an accurate appraisal of the strength of the state's case, with deleterious consequences for him. The petitioner testified that, as a result of Tanya's interference, Castignoli was unable to explain the plea offer to him. Castignoli, however, recalled having discussions about the plea offer. The petitioner testified that, if the plea offer had been explained to him and he had not followed Tanya's insistence on a plea offer of ten years, then he would have accepted the offer.

The petitioner acknowledged having a very close relationship with Tanya. When asked at the habeas trial whether he was relying on Tanya in her role as his mother, rather than as his guardian ad litem, he answered that he was relying on her as "[b]oth." He acknowledged that he wanted her input and, even if she had been removed as his guardian ad litem, they would still be able to speak to each other on the phone and she was on his visitor list at the Manson Youth Institution, where he was being held.

Castignoli did not recall requesting that Tanya be fully removed as the petitioner's guardian ad litem. He explained: "I really thought [Tanya] was going to speak

to [the petitioner] anyways. They had a very close relationship. I thought it was counterproductive to take her out of everything all together." He thought having Tanya removed would be a disadvantage because, at the end of the day, she was the petitioner's mother, and they could speak on the phone or during visiting hours. The respondent's counsel asked Castignoli whether he thought, with keeping Tanya "in the loop, [he] would know what was going on with their conversations, versus being completely out of the loop and working against [him]," he answered: "Yeah. . . . I just felt taking her out of it completely would have been counterproductive. . . . Yes. The answer's yes." In addition, the respondent's counsel asked Castignoli whether it was his position that he and the petitioner "were going to be in a worse position for negotiation purposes . . . if you essentially turned [Tanya] into an enemy," and Castignoli responded: "Yes. Definitely."

In its memorandum of decision, the habeas court concluded that the petitioner had failed to meet his burden of demonstrating that Castignoli performed deficiently and that he was prejudiced by Castignoli's allegedly deficient performance. Specifically, the court concluded: "The evidence establishes that [Castignoli] *did* seek to replace Tanya as the [guardian ad litem]. During the hearing on the motion on September 22, 2006, he specifically asked for removal of Tanya as the [guardian ad litem] as one option, with another [guardian ad litem] being appointed as the second. The court had a lengthy hearing on the motion, hearing from [Castignoli and Marquette], [the petitioner], Tanya and the state, before deciding that a [guardian ad litem] was appropriate and appointing a second [guardian ad litem]. Additionally, the testimony establishes that [the petitioner] and his mother had an extremely close relationship and he followed her lead on what to do in this case. [Castignoli] testified that he made a strategic decision not to seek

complete removal of Tanya because he did not want to create further conflict in his relationship with [the petitioner], and, given the closeness of the relationship between [the petitioner] and his mother, he was certain they would speak about the case anyway. There was no deficient performance here.

"The court has no doubt that [the petitioner] was influenced by his mother to pursue the course he did, and that it was contrary to counsel's advice and that it probably was against his own best interests. The court understands [the petitioner's] frustration that, had he not listened to his mother, or had his mother not interfered in a manner contrary to his interests, that he may well have been serving a much shorter sentence. However, the blame, if any, lies with his mother, not with [Castignoli]. [Castignoli] made repeated attempts to communicate with [the petitioner] and conveyed offers to him and his mother. He explained the state's evidence to [the petitioner]. Tanya had a different view of the evidence and either convinced [the petitioner] to not accept any offer of less than ten years or interfered with [Castignoli's] ability to effectively represent his client. Clients are free to make bad choices after being appropriately advised by counsel. [The petitioner] did so here, whether on his own or under the influence of his mother. Fault for this cannot be placed at the feet of [Castignoli].

"There is also no prejudice. [The petitioner's] own remarks at the motion hearing make clear that he and Tanya felt that [Castignoli and Marquette] were pressuring them into accepting a plea, and [the petitioner] stated more than once that he, *independently*, had decided not to accept any offer: 'I chose to go to trial myself. I chose to plead not guilty. My mother did not force me to do it. I chose that decision.' Of course, the court is mindful that these are the comments of a seventeen year old facing life imprisonment, still guided

by his mother, in the heat of a contested hearing on the record. Nevertheless, this is contemporaneous evidence that undermines his burden of proof on the prejudice prong in this habeas petition. Perhaps if Tanya were not in the picture at all, there could arguably be a reasonable likelihood that [the petitioner] would have accepted the offer. However, the court does not believe that simply removing Tanya as the [guardian ad litem], while still preserving her access to and influence over [the petitioner], would have resulted in a different outcome. Put another way, the problem was not Tanya's status as the [guardian ad litem]; rather, it was her active participation in the case and influence over [the petitioner]. [The petitioner] has not proven that there is a reasonable likelihood that he would have accepted the offer and that the court would have conditionally accepted his guilty plea." (Emphasis in original; footnotes omitted.)

As the court concluded, Castignoli did seek Tanya's removal as the petitioner's guardian ad litem by requesting a substitute guardian ad litem in his motion and at the start of the hearing on September 22, 2006, with the appointment of an additional guardian ad litem as another option. Moreover, Castignoli's decision not to further pursue Tanya's complete removal as the petitioner's guardian ad litem was an appropriate matter of strategy. "[O]ur review of an attorney's performance is especially deferential when his or her decisions are the result of relevant strategic analysis. . . . Thus, [a]s a general rule, a habeas petitioner will be able to demonstrate that trial counsel's decisions were objectively unreasonable only if there [was] no . . . tactical justification for the course taken." (Citation omitted; internal quotation marks omitted.) *Spearman* v. *Commissioner of Correction*, 164 Conn. App. 530, 540–41, 138 A.3d 378, cert. denied, 321 Conn. 923, 138 A.3d 284 (2016). In the present case, Castignoli reasonably took account

of the close relationship between the petitioner and Tanya and made a considered tactical decision not to further pursue removing Tanya as one of the petitioner's guardians ad litem because he thought it would be "counterproductive" and could further impede the discussions between him and the petitioner. Given the enmeshed relationship between Tanya and her son, we conclude that this was a reasonable strategic decision, as the habeas court determined.

The petitioner contends that Castignoli's September, 2006 motion and the resulting appointment of a second guardian ad litem was "too little and far too late to be of any use to the petitioner" because the pretrial plea negotiations that had been impacted by Tanya's interference took place almost one year earlier.[14] We are not persuaded. With respect to the timing of Castignoli's request, Castignoli stated at the hearing on his motion that his disagreements with Tanya had been "normal . . . up until very, very recently . . . ."[15] Moreover, at the habeas trial, both Castignoli and the petitioner recalled receiving an offer from the state during closing arguments—after the second guardian ad litem had been appointed—with a cap of thirty-two years and a base of twenty-eight years of incarceration, which was similar to the pretrial offer that would have resulted in a sentence between twenty-five and thirty years of imprisonment. Accordingly, we cannot conclude that Castignoli's efforts to ensure that the petitioner had a second guardian ad litem were too little, too late, as the petitioner argues.

We also conclude that, irrespective of the reasonableness of Castignoli's performance, his failure to have Tanya fully removed as the petitioner's guardian ad

---

[14] The petitioner's counsel made a similar argument at the habeas trial that getting an additional guardian ad litem "wasn't done in time."

[15] The record does not reflect why Castignoli did not seek a substitute or additional guardian ad litem prior to his September, 2006 motion.

litem did not prejudice the petitioner. As the habeas court observed, even if Tanya were removed as guardian ad litem, she would still have had access to and influence over the petitioner, given that she was his mother, and the evidence demonstrated that they had a very close relationship. Thus, there is not a reasonable probability that Tanya's removal as a guardian ad litem would have resulted in a different outcome.

Moreover, in the present case, the only evidence presented by the petitioner in support of his claim of prejudice was his own testimony at the habeas trial that, if Tanya had not interfered with plea negotiations and he had received an explanation of the plea offer he was given, he would have accepted it. The habeas court, as the trier of fact, found that "[the petitioner] has not proven that there is a reasonable likelihood that he would have accepted the offer" and implicitly discredited the petitioner's testimony. See, e.g., *Watts* v. *Commissioner of Correction*, supra, 194 Conn. App. 566 (habeas court implicitly discredited petitioner's testimony that he would have accepted plea offer). "It is well established that [t]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Internal quotation marks omitted.) Id.

Finally, we note that the habeas court's finding is supported by contemporaneous evidence, specifically, the petitioner's own statements at the September 22, 2006 hearing that he believed that his attorneys were pressuring him into accepting a plea offer and that he, independently, had chosen to plead not guilty and that Tanya did not force him to do so. See, e.g., *Grant* v. *Commissioner of Correction*, 342 Conn. 771, 781, 272 A.3d 189 (2022) (considering whether petitioner produced contemporaneous evidence to support assertion that, but for deficient performance of trial counsel, there was reasonable probability he would have

rejected plea offer and proceeded to trial). Accordingly, the petitioner failed to meet his burden of demonstrating prejudice.

## III

The petitioner also claims that the habeas court improperly denied his freestanding due process claim on the basis of procedural default. Again, we are not persuaded that the petitioner has demonstrated that this claim is debatable among jurists of reason, that a court could resolve the issue in a different manner, or that the claim raises a question that deserves encouragement to proceed further.[16]

As an initial matter, "a habeas court's conclusion that a petitioner's claim is barred by the procedural default doctrine involves a question of law over which we exercise plenary review." *Kukucka* v. *Commissioner of Correction*, 225 Conn. App. 159, 165, 314 A.3d 631, cert. denied, 350 Conn. 904, 323 A.3d 342 (2024).

Under the procedural default doctrine, "a claimant may not raise, in a collateral proceeding, claims that he could have made at trial or on direct appeal in the original proceeding and that if the state, in response, alleges that a claimant should be procedurally defaulted from now making the claim, the claimant bears the burden of demonstrating good cause for having failed to raise the claim directly, and he must show that he suffered actual prejudice as a result of this excusable failure." *Hinds* v. *Commissioner of Correction*, 151

---

[16] The petitioner also claims that the habeas court incorrectly concluded, in the alternative, that his due process claim was meritless. Because the petitioner has failed to demonstrate that the habeas court's resolution of his claim on procedural default grounds is debatable among jurists of reason, that a court could resolve the issue in a different manner, or that the claim raises a question that deserves encouragement to proceed further, we do not address this aspect of the petitioner's claim.

Conn. App. 837, 852, 97 A.3d 986 (2014), aff'd, 321 Conn. 56, 136 A.3d 596 (2016).

"The cause and prejudice standard [of reviewability] is designed to prevent full review of issues in habeas corpus proceedings that counsel did not raise at trial or on appeal for reasons of tactics, [inadvertence] or ignorance . . . . [T]he existence of cause for a procedural default must ordinarily turn on whether the [petitioner] can show that some objective factor external to the defense impeded counsel's efforts to comply with the [s]tate's procedural rule." (Internal quotation marks omitted.) *Woods* v. *Commissioner of Correction*, 197 Conn. App. 597, 623, 232 A.3d 63 (2020), appeal dismissed, 341 Conn. 506, 267 A.3d 193 (2021) (certification improvidently granted).

In the present case, the petitioner claimed that ineffective assistance of counsel served as the cause and prejudice for any procedural default. "[A] successful ineffective assistance of counsel claim can satisfy the cause and prejudice standard so as to cure a procedurally defaulted claim. . . . Indeed, [i]f a petitioner can prove that his attorney's performance fell below acceptable standards, and that, as a result, he was deprived of a fair trial or appeal, he will necessarily have established a basis for cause and will invariably have demonstrated prejudice." (Citation omitted; internal quotation marks omitted.) *McCarthy* v. *Commissioner of Correction*, 192 Conn. App. 797, 810, 218 A.3d 638 (2019).

"Ineffective assistance of counsel is an objective factor external to the defense because the [s]ixth [a]mendment itself requires that responsibility for the default be imputed to the [s]tate. . . . In other words, it is not the gravity of the attorney's error that matters, but that it constitutes a violation of [the] petitioner's right to counsel, so that the error must be seen as an external

factor, i.e., imputed to the [s]tate. . . . Although a petitioner is bound by his counsel's inadvertence, ignorance, or tactical missteps, regardless of whether counsel is flouting procedural rules or hedging against strategic risks, a petitioner is not bound by the ineffective assistance of his counsel." (Citation omitted; internal quotation marks omitted.) *Rose* v. *Commissioner of Correction*, 348 Conn. 333, 347–48, 304 A.3d 431 (2023).

In its memorandum of decision, the habeas court concluded that the petitioner's due process claim was procedurally defaulted. The court explained that the petitioner "raises a self-admittedly novel claim that the trial court had an obligation to inquire into whether Tanya was fulfilling the role of a [guardian ad litem]. . . . The court finds that this claim is procedurally defaulted because it was not raised on appeal, and [the petitioner] has not proven cause and prejudice. The claim centers around the violation of his due process rights and the trial court's duty to ensure that the [guardian ad litem] was operating in [the petitioner's] best interests. The factual predicate for this claim was apparent from the record and did not need the development of facts outside the record. It could have been raised on direct appeal but was not. Appellate counsel was not called as a witness to explain their decision to not pursue this claim. Thus, the court finds that it is procedurally defaulted."

We agree with the habeas court that the petitioner's due process claim was procedurally defaulted. As the habeas court determined, the petitioner could have raised the claim on direct appeal, and he did not establish that his failure to do so was the result of ineffective assistance from his appellate counsel. The petitioner did not call his appellate counsel as a witness at the habeas trial, and he did not present any other evidence regarding appellate counsel's reason for not raising the due process claim in the direct appeal.

In the absence of any evidence to the contrary, we presume that the petitioner's appellate counsel acted reasonably. "[I]t is not necessary for a reviewing court to resolve what strategic decisions defense counsel *actually* made, but it is required to presume that the challenged actions were within the wide range of reasonable professional conduct if, under the circumstances, it *might have been* sound [appellate] strategy." (Emphasis in original; internal quotation marks omitted.) *Revels* v. *Commissioner of Correction*, 229 Conn. App. 461, 474 n.8, 327 A.3d 418 (2024), cert. denied, 351 Conn. 906, 330 A.3d 133 (2025).

In the petitioner's direct appeal, the petitioner's appellate counsel raised several claims regarding the admission of evidence of certain incriminating statements made by the petitioner, including a claim under *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). See *State* v. *Canady*, supra, 297 Conn. 324–25. "[Although] an appellate advocate must provide effective assistance, he is not under an obligation to raise every conceivable issue. . . . The determination of which issues to present, and which issues not to present, on an appeal is by its nature a determination committed to the expertise of appellate counsel, and not to his client. . . . [A] habeas court will not, with the benefit of hindsight, second-guess the tactical decisions of appellate counsel." (Citation omitted; internal quotation marks omitted.) *Donald G.* v. *Commissioner of Correction*, 224 Conn. App. 93, 125, 311 A.3d 187, cert. denied, 349 Conn. 902, 312 A.3d 585 (2024). Accordingly, the petitioner's appellate counsel may have made a reasonable tactical decision not to raise the due process claim. We therefore agree with the habeas court that the petitioner failed to establish ineffective assistance of counsel to satisfy the cause and prejudice standard to overcome his procedural default in failing to raise his due process claim in his direct appeal.

On appeal, the petitioner focuses on the habeas court's characterization of his due process claim as "novel." He does not challenge the court's conclusion that he failed to establish ineffective assistance of appellate counsel, instead stating that "[t]here is no law on point in this jurisdiction and thus nothing that a reasonably competent appellate attorney should have researched and raised." He contends, for the first time on appeal, that the novelty of his claim, in and of itself, constitutes cause to overcome the procedural default.

"Although ineffective assistance of counsel . . . is the most commonly asserted basis for cause to excuse procedural default . . . it is not the exclusive basis. . . . [T]he cause requirement may be satisfied under certain circumstances when a procedural failure is not attributable to an intentional decision by counsel made in pursuit of his client's interests. . . . [T]he failure of counsel to raise a constitutional issue reasonably unknown to him is one situation in which the requirement is met." (Citation omitted; internal quotation marks omitted.) *Kukucka* v. *Commissioner of Correction*, supra, 225 Conn. App. 165; see also *Saunders* v. *Commissioner of Correction*, 343 Conn. 1, 26, 272 A.3d 169 (2022) (novel constitutional claim could give rise to cause and excuse procedural default).

Before the habeas court, the petitioner did not claim that the novelty of his due process claim excused his procedural default. "It is well settled that this court is not bound to consider any claimed error unless it appears on the record that the question was distinctly raised at trial and was ruled upon and decided by the court adversely to the appellant's claim. . . . It is equally well settled that a party cannot submit a case to the trial court on one theory and then seek a reversal in the reviewing court on another. . . . To review such a newly articulated claim, would amount to an ambuscade of the [habeas] judge." (Citation omitted; internal

quotation marks omitted.) *Peeler* v. *Commissioner of Correction*, 170 Conn. App. 654, 677, 155 A.3d 772, cert. denied, 325 Conn. 901, 157 A.3d 1146 (2017).

Although the petitioner characterized his due process claim as "novel" at the habeas trial, he did not assert that it was so novel as to excuse the procedural default.[17] Instead, both in his reply to the respondent's return and at trial, he asserted that ineffective assistance of counsel served as the basis for good cause to excuse any procedural default. Accordingly, because the court was not provided with an opportunity to make any factual or legal findings with respect to the petitioner's claim that the novelty of his due process claim constituted cause to excuse his procedural default, we decline to review that claim now for the first time on appeal. See *Peeler* v. *Commissioner of Correction*, supra, 170 Conn. App. 676–77 (declining to review claim raised for first time on appeal that due process claim was " 'premature' " at time of direct appeal, as cause to excuse procedural default, where petitioner argued in reply that his failure to appeal issue was, instead, due to ineffective assistance of appellate counsel).

The petitioner has failed to demonstrate that his claims on appeal are debatable among jurists of reason, that a court could resolve the issues in a different manner, or that they raise a question that deserves encouragement to proceed further. Accordingly, the habeas court did not abuse its discretion in denying the petition for certification to appeal.

The appeal is dismissed.

In this opinion the other judges concurred.

---

[17] "[Even if a] constitutional claim would have been one of first impression if made at the trial court, that does not lead us to conclude automatically that the claim is so novel as to excuse the procedural default." *Brunetti* v. *Commissioner of Correction*, 134 Conn. App. 160, 173, 37 A.3d 811, cert. denied, 305 Conn. 903, 44 A.3d 180 (2012).